**SHAPIRO, BERNSTEIN & CO., Inc.,
Plaintiff-Appellant-Appellee,**

v.

**REMINGTON RECORDS, INC., Defendant-Appellee-Appellant,
Donald H. Gabor, Defendant.**

**OXFORD MUSIC CORPORATION, Plaintiff-Appellant-Appellee,**

v.

**REMINGTON RECORDS, INC., Defendant-Appellee-Appellant,
Donald H. Gabor, Defendant.**

**ST. NICHOLAS MUSIC, INC., Plaintiff-Appellant-Appellee,**

v.

**REMINGTON RECORDS, INC., Defendant-Appellee-Appellant,
Donald H. Gabor, Defendant.**

**MERIDIAN MUSIC CORP., Plaintiff-Appellant-Appellee,**

v.

**REMINGTON RECORDS, INC., Defendant-Appellee-Appellant,
Donald H. Gabor, Defendant.**

**No. 86, Docket 25216.**

United States Court of Appeals
Second Circuit.

Argued Jan. 13, 1959.

Decided April 3, 1959.

Julian T. Abeles, New York City (Abeles & Bernstein, New York City, on the brief), for plaintiffs-appellants-appellees.

Maxwell Okun, New York City, for defendant-appellee-appellant.

Before MEDINA, LUMBARD and BURGER, Circuit Judges.

BURGER,* Circuit Judges.

Four different plaintiffs, all music publishers, brought suit against Donald H. Gabor and Remington Records, Inc. Gabor and his wife own all the stock of Remington, a phonograph record manufacturer and distributor.[1] These actions were brought under the provisions of the Copyright Act (Title 17 U.S.C. § 1 et seq., and 28 U.S.C. § 1338) relating to the compulsory licensing of phonograph records. The claims of all four plaintiffs are based on substantially the same conduct on the part of the defendants. The complaints charged that defendants had infringed copyrights of plaintiffs by reproducing on records plaintiffs' copyrighted musical compositions without complying with the statutory provision requiring prior notice and payment of royalties.

Section 1(e), Title 17 U.S.C., provides that, when a copyright proprietor has once permitted or acquiesced in the use of his copyrighted work, others may make similar use by paying the owner a royalty of two cents on each record manufactured; it also requires monthly production reports to be furnished in support of the royalty payments if the copyright owner so requests.[2]

The Copyright Act also provides:

"[W]henever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this title [17 U.S.C. § 1 (e)], he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in its discretion, in addition to the sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e) ["payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured"] * * * by way of damages * * * ". 17 U.S.C. § 101(e).

Plaintiffs moved for summary judgment and for the appointment of a special master to determine the amount of royalties due. Defendants, in their answer, denied failure to give notice, but they admitted manufacture of records of copyrighted compositions and admitted liability in some amount for royalties under § 1(e). The only issues left were the amount due each plaintiff under the two cents per unit royalty provision and whether punitive damages under § 101 (e), costs and attorney fees should also be charged against defendants. On the admissions of defendants summary judgment was entered finding liability, and a special master was appointed to ascertain the amount of royalties due and the damages and costs, if any, to be allowed.

The Special Master conducted a total of nine separate hearings extending over a period of more than three years. His findings, report and award, which were adopted in full by District Judge Conger, fixed royalties due each of the plaintiffs and awarded the maximum amount of punitive damages permitted by § 101(e).

---

* Sitting by designation pursuant to 28 U.S. C.A. § 291(a).

1. Because of the cross appeals the parties will be described by reference to their trial court posture as plaintiffs and defendants to avoid confusion.

2. "[T]he copyright proprietor *may* require, *and if so* the manufacturer shall furnish, a report under oath on the 20th day of each month * * * ". (Emphasis added.)

His computation is set out in the footnote.[3]

The District Judge then ordered defendants to pay attorneys' fees, set at $1,000 for each of the four plaintiffs and to pay the Special Master a fee of $1,200 or $300 for each plaintiff, making a total of $4,200 in costs assessed against defendants in addition to the total award of $4,472.48.

Defendants, Remington and Gabor, appeal from the allowance of the maximum permissible (treble) punitive damages, attorneys' fees and costs. Defendants also challenge the finding that they failed to give plaintiffs the notice required by the Copyright Act. We hold that the appeals of the defendants from the allowance of statutory damages, costs, and attorneys' fees are without merit.

Plaintiffs' appeals are based on the ruling of the District Judge approving the Master's striking of certain expert opinion testimony as to the number of records manufactured by defendants. The plaintiffs, after developing by testimony of Gabor and officers of Remington that the defendants had consciously and deliberately failed to keep any account of a substantial part of their production of plaintiffs' copyrighted records, offered as an expert witness one Albert Berman to show the estimated volume of copying. After showing his knowledge and experience in connection with the phonograph record industry,[4] Berman was permitted to testify that, in his opinion, defendants had manufactured, according to what he described as a "conservative estimate * * * 30,000 of each record" in question prior to a fixed date as to each composition.[5] This testimony was received over objection and then stricken by the Master "on the ground that no proper foundation * * * was laid and in my opinion such testimony in the form given is not within the realm of expert testimony and is purely speculative." In affirming the Master's ruling, Judge Conger, with obvious reluctance,[6] said

3.

| Plaintiff (Composition involved) | No. of Records | Royalties at 2¢ | Punitive Damages at 6¢ |
|---|---|---|---|
| Shapiro, Bernstein & Co. .......... ("Be Anything, But Be Mine") | 12,834 | $ 256.68 | $ 770.04 |
| Oxford Music Corp. .............. ("There's a Pawnshop On The Corner") | 12,834 | 256.68 | 770.04 |
| St. Nicholas Music, Inc. .......... ("Rudolph, The Red-Nosed Reindeer") | 9,180 | 183.60 | 550.80 |
| Meridian Music Corp. ............ ("Blue Velvet") | 21,808 | 436.16 | 1,308.48 |
| Totals ........................ | 56,656 | $1,133.12 | $3,339.36 |

4. Berman also showed his knowledge of these particular defendants' operations. He was head of the royalty collection department of Harry Fox, agent for more than 300 leading music publishers; Fox had issued more than 100 licenses to the defendants.

5. "Q. Based upon that testimony and your experience in the business, taking into consideration a record manufacturing company in the category of the defendant, Remington Records, Inc., and the musical compositions in the category of the four musical compositions involved in this proceeding, what would be the minimum quantity of phonograph records manufactured by the defendant, Remington Records, Inc., of each of said compositions in suit prior to the initial shipment?

* * * * *

"A. I would say a conservative estimate should be 30,000 of each record."

6. "I agree with plaintiffs that this is the type of case in which this liberal rule might be applied."

that "there are not sufficient facts in this hypothetical question on which an expert can base an answer."

The relations which give rise to this litigation flow in part from the applicable statutory scheme and in part from the practices of some elements within the phonograph record industry. Once a copyright owner makes his musical work available to any record manufacturer it becomes subject to the compulsory licensing provisions of the Copyright Act and may be copied by others simply upon their giving notice of intention and thereafter paying the royalty fixed by the statute. 17 U.S.C. §§ 1(e), 101(e). Defendant Remington's method of operation under this statute—a method apparently typical of some segments of the record industry—was described by several witnesses, including Lee Weiser, Remington's secretary and in charge of its accounting department at the time of the disputed conduct.

Weiser testified that Remington would never produce a popular recording until the song had already established itself "in the top ten listing." When it made these copies, Remington did not advertise the records, but relied on the popularity already achieved and the sales promotion efforts of the first publisher. It appears, beyond question, that in order to exploit this situation, defendants had to have a "crash program" which would get the largest possible volume of records into the market while the song's popularity and resulting demand were at their peak. This was made necessary by the relatively short duration (measurable in terms of weeks) of the song's position on the "top ten listing." If Remington's copying venture was to be profitable, speed was essential.

Consistent with this pattern of operations the evidence indicates that by far the greater amount of Remington's total production of these records occurred at the outset and before the first shipment of records was made to the distributors, i. e., before the "initial shipment" described in the testimony. Once it became apparent that a song was to be a hit, Remington would rush into production with a large initial pressing, with the later and diminishing demand supplied, if the demand continued, by subsequent production.

In this case it is the quantity of records manufactured before the initial shipment date, i. e., production under the "crash program," which is crucial but unknown except for the estimate of the expert witness Berman whose testimony was rejected by the Special Master. Defendants, after much delay, produced an account of the lesser number of records that they manufactured *after* the initial shipment, and the judgment below represents the royalties and damages only for those records. It was the view of the Special Master that, were the true figures available as to production before the "initial shipment" date, plaintiffs' awards would be substantially greater. Had Berman's opinion testimony been accepted, it would have more than doubled plaintiffs' recovery.

Before proffering Berman's opinion testimony plaintiffs made extensive efforts to adduce direct documentary proof of defendants' production prior to the initial shipment or "release" date, but they were frustrated by the defendants. Plaintiffs tried to use certain inventories and sales records secured from defendants, but these proved incomplete or patently inaccurate. At one hearing before the Master defendant Gabor testified that certain inventory and sales records, which were available, would be sufficient for computing the total number of records manufactured before the initial shipment. Yet, when these documents were produced, after much delay and upon order, they shed no light on the production preceding the initial shipment. Even a cursory examination of these records shows their inadequacy. The record plainly shows that plaintiffs made exhaustive efforts to procure better evidence before they offered Berman's opinion.

Taken altogether the evidence discloses that by one means or another defendants prevented proof by direct evidence of the

true facts essential to an accurate determination of the amount of royalties due under the Act. Moreover, defendants failed to offer evidence contradicting plaintiffs' claims and their only attempt to rebut the estimate proffered by plaintiffs' expert consisted of eliciting a negative answer to the question if he knew of his own knowledge "whether one phonograph record was actually manufactured before the release date." Defendants' tactics consisted of "sitting tight" and relying on their own wrongful acts to make it impossible for plaintiffs to prove a case by direct evidence.

Since it was this course of conduct by defendants which compelled the plaintiffs to resort to opinion evidence in their attempt to prove the basic issue in the case, i. e., the extent of royalties due, it is important to summarize what the record shows about defendants' practices. Commencing with a finding that defendants did not in fact give the statutory notice they claim to have given, the Master's report discloses an astonishing course of conduct by defendants. In affirming the finding on defendants' failure to give notice, Judge Conger said:

> "It [defendant Remington] never attempted to comply in any way with the compulsory license provision of the Copyright Act * * *. Defendant never served the required notice on plaintiffs nor did it file a duplicate of such notice in the Copyright Office. What it did do was to write to plaintiffs for a license agreement covering each of the musical numbers. The royalty said defendant agreed to pay was much less in each case [7] than that required under the provisions of the Compulsory License Act. These letters were simply requests for a license at a stipulated royalty, which was never granted. The evidence clearly indicates, as the special master found, that the said defendant never served notice of its intention to

make use of plaintiffs' compositions and such use was made without authorization, permission, consent or license."

■   Aside from the nature of the letters sent by defendants two additional facts of record support the finding that they failed to give the notice required by the statute. First, the record shows that, in each case, the letter was sent by the defendant Remington *long after* the large initial shipment of infringing records had been made. Second, for a year after they claim to have given notice, defendants made no report or accounting of royalties to the plaintiffs. Thus the evidence amply supports the finding that there was failure of notice. This finding is important, first because it is the statutory predicate for an award of punitive damages, and second because it sheds light on defendants' subsequent conduct, characterized by plaintiffs as trade "piracy."

The second important aspect of defendants' conduct—their failure to keep adequate records—was established by the testimony of their own officers and employees. The record shows defendant Gabor testifying:

> "Q. What records would there be of the phonograph records manufactured regardless of whether they were shipped, distributed or sold? A. We wouldn't have any records.
>
> *   *   *   *   *   *
>
> "Q. Let me understand. You say that you keep no records whatever of the number of phonograph records manufactured? A. That is correct.
>
> *   *   *   *   *   *
>
> "Q. But you know don't you that if you manufacture any records without a license and you don't keep records and books of the number manufactured there would be no way for the publisher to ascertain how

---

**7.** Although no offer was explicitly made the letters said: "other publishers have been most cooperative with us in con-

nection with this matter, and have issued licenses at 1¢ or 1¼¢ rate." (Footnote supplied.)

many were manufactured? A. Yes, I do.

     *    *    *    *    *    *

    "Q. And you also know that under the Copyright Act if you don't obtain a license from the publisher you are liable for payment with respect to the number of records manufactured don't you? A. Yes, I do."

The Special Master found that

    "Witness Gabor testified * * that upon the advice of his accountants no records had been made or kept of the number of phonograph records manufactured of plaintiffs' compositions. This and other evidence showed the defendants acted knowingly in total disregard of plaintiffs' rights."

It is plain, and indeed is conceded by the plaintiffs, that without the estimate of the witness Berman, there is no basis in the evidence for ascertaining the royalties owed on the production prior to the "initial shipment" date. The findings of the Master, adopted by the District Court, are amply supported by testimony which shows the defendants completely—and deliberately—frustrated direct, documentary proof of the amount of royalties due plaintiffs for the period prior to the initial shipment. The central issue in this case then is whether the opinion testimony of the witness Berman should have been received in these circumstances to prove the amount owed. Of necessity we shall also reach the broader question as to what kind of evidence should be received by courts in circumstances where direct proof of royalties due has been made impossible by the deliberate and calculated acts of the defendant.

    Perhaps the best starting point is the Copyright Act itself. No case has yet spelled out the obligations and burdens of manufacturers who avail themselves of the record reproducing privilege under § 1(e) of the Act. We undertake to do that now for the assistance of the District Court to which the case will be remanded for further proceedings. Perhaps it will also serve as a guide, if not a deterrent, to such members of the industry who engage in what has been described as "piracy," but which might better be described by other terms connoting larceny; historically, at least, piracy was characterized by frontal attack with unmistakable notice to the victim who could then take such means as were available to defend himself.

    The provision of the Copyright Act requiring the copier to give notice and to supply the copyright proprietor with sworn monthly production reports is the keystone of the compulsory licensing scheme. That this statute contemplates an obligation upon the copier to keep accurate production records is beyond argument. Without the notice, of course, the copyright proprietor is not likely to be aware that another manufacturer is exercising § 1(e) privileges. Since a large part of the records will be distributed and sold almost immediately upon manufacture, and since the number manufactured, not the number sold, is the royalty criterion, it is vital for the copyright proprietor to have prompt notice. Only with this notice can he demand sworn statements of the number produced while records are available or memories are still fresh. Particularly since many copiers may avail themselves of the statute simultaneously, the notice and sworn monthly reports are the primary, if not the exclusive protection for the copyright proprietor.

    ■■ The legislative history of the Copyright Act shows that Congress was seeking to reach a balance between adequate protection for the proprietor of a musical work on the one hand and the avoiding of "a great music monopoly" on the other.[8] To accomplish this Congress developed this statutory scheme of com-

---

**8.** "It was at first·thought by the committee that the copyright proprietors of musical compositions should be given the exclusive right to do what they pleased with the rights it was proposed to give them to control and dispose of all rights of mechanical reproduction, but the hearings disclosed that the probable effect of this would be the establishment of a mechanical-music trust. It became evi-

pulsory licensing which gives to the public, particularly those situated as defendants Remington and Gabor, valuable privileges or rights which are a substantial limitation on what would otherwise be absolute proprietary rights of the copyright owner. This limitation on the proprietor's rights imposes a corollary duty on those desiring to copy the copyrighted composition. This duty is implicit, if indeed not expressed, in the statutory provision for a two cent royalty and in the obligation to supply sworn reports and accounts to the copyright owner upon demand. Plainly this makes it mandatory for the copier of such works to keep records·from which the statutory statements under oath can be prepared.

Our view of the manufacturer's obligation to keep production records requires us to consider also what consequences, if any, flow from deliberate failure to keep such records. We find a clue but not a complete answer in the established and accepted doctrine that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. v. Southern Photo Materials Co., 1927, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684. In analogizing the present case to cases concerning proof of *damages*, it must be remembered that we are not here dealing with damages in the general sense of that word but rather with statutory compensation in the form of a royalty or license fee predicated upon the number of phonograph records manufactured, a measure that can be applied with absolute precision and hence absolute fairness if there are adequate records of production. Where courts have been concerned with the problem of "speculative damages," they have generally been dealing with a situation where no precise measure is available because of the very nature of the claim and where the amount of recovery is dependent upon many intangible and contingent factors. See, e. g., Palmer v. Connecticut Ry. & Lighting Co., 1941, 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336; Matarese v. Moore-McCormack Lines, Inc., 2 Cir., 1946, 158 F.2d 631, 170 A.L.R. 440 (both cases in which an allowance of damages was upheld despite an attack on the ground that the judgment was too speculative).

Judge Conger sought earnestly to find some basis on which to allow plaintiffs a more adequate recovery, but he concluded that on the evidence available "there can be no reasonable approximation upon the facts and nothing to base a judgment." He recognized that this situation was due to the willful and deliberate effort of the defendants to frustrate proof of their undisputed liability under the statute. Treating the issue as one of determining *damages* in the conventional sense, one is bound to be confronted with the same obstacles which frustrated the Special Master and the District Court.

dent that there would be serious danger that if the grant of right was made too broad, the progress of science and useful arts would not be promoted, but rather hindered, and that powerful and dangerous monopolies might be fostered which would be prejudicial to the public interests. This danger lies in the possibility that some one company might secure, by purchase or otherwise, a large number of copyrights of the most popular music, and by controlling these copyrights monopolize the business of manufacturing the [*sic*] selling music-producing machines, otherwise free to the world.

"The main object to be desired in expanding copyright protection accorded to music has been to give to the composer an adequate return for the value of his composition, *and it has been a serious and a difficult task to combine the protection of the composer with the protection of the public,* and to so frame an act that it would accomplish *the double purpose of securing to the composer an adequate return for all use made of his composition and at the same time prevent the formation of oppressive monopolies,* which might be founded upon the very rights granted to the composer for the purpose of protecting his interests." H.R.Rep. No. 2222, 60th Cong. 2d Sess. 7 (1909), reprinted in Howell, The Copyright Law 200 (1942). (Emphasis added.)

But when we view the problem in the light of the peculiar and unusual relations of the parties as established by the Copyright Act, and consider this in light of what the courts have said in patent, trademark and other comparable situations, a remedy adequate for the needs of the case can be found.

When the defendants availed themselves of the benefit of the compulsory licensing scheme of the Copyright Act by manufacturing records without following the statutory obligations of notice and reports, they placed themselves in much the same position as a trustee who commingles his own property with like property of others. Chancellor Kent long ago stated the rule which controls a fiduciary who converts or commingles property of the beneficial owner with his own. He said:

> "The rule of law and equity is strict and severe on such occasions. If a party having charge of the property of others, so confounds it with his own, that the line of distinction cannot be traced, all the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it. If it be a case of damages, damages are given *to the utmost value* that the article will bear." Hart v. Ten Eyck, 1816, 2 Johns.Ch., N.Y., 62, 108.

Nor is the instant case the first time that this rule has been applied to situations where both the right and the measure of liability is fixed by a statute. This was long the rule in patent cases which have significant common roots with the problem now before us, and Hart v. Ten Eyck was cited by the Supreme Court when it first shaped the rule applying to patent cases. Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 1912, 225 U.S. 604, 621, 32 S.Ct. 691, 56 L.Ed. 1222. Under early patent law [9] patent proprietors were permitted to recover profits realized by an infringer from his wrongful use of the article which infringed plaintiff's patent. Computation of liability under this statutory scheme was particularly difficult when the infringer combined the infringing article with one or more other patented elements which did not infringe plaintiff's patent. To meet this problem, the courts developed and the Supreme Court approved the rule that, where profits from the infringing article were so confused and commingled with the profits from other elements that the plaintiff was unable to separate the strands, the *defendant* was given the burden of proving what profits were *not* attributable to the infringing article. Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., supra; see also Gotham Silk Hosiery Co. v. Artcraft Silk Hosiery Mills, Inc., 3 Cir., 1944, 147 F.2d 209, 214–216; Levin Bros. v. Davis Mfg. Co., 8 Cir., 1934, 72 F.2d 163. A similar result has been reached with respect to trademark cases where the statute also permits the plaintiff to recover the defendant's profits. 60 Stat. 439 (1946), 15 U.S.C.A. § 1117; see Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1942, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381; Dickinson v. O. & W. Thum Co., 6 Cir., 1925, 8 F.2d 570; Price, Financial Recovery in an Action for Trademark Infringement, 47 Trademark Rep. 1297, 1308–12 (1957).

Commenting on Armory v. Delamirie, infra, an early American authority summarized the broad base for this rule in these terms:

> "When the nature of a wrongful act is such that it not only inflicts an injury, but takes away the means of proving the nature and extent of the loss, the law will aid a recovery against the wrong-doer and supply the deficiency of proof caused by his misconduct, *by making every reasonable intendment against him,* and in favor of the party whom he has injured. A man who wilfully places

9. Rev.Stat. § 4921 (1875), amended by Act of Aug. 1, 1946, 60 Stat. 778, to allow damages "not less than a reasonable royalty therefor." Now 35 U.S.C. § 284.

the property of others in a situation where it cannot be recovered, *or its true amount or value ascertained,* by mixing it with his own, or in any other manner, will consequently be compelled to bear all the inconveniences of the uncertainty or confusion which he has produced, even to the extent of surrendering the whole if the parts cannot be discriminated, or responding in damages for the highest value at which the property in question can reasonably be estimated." 1 Smith's Leading Cas. (pt. 1) 589 (6th American ed. 1866) (Emphasis added).

Perhaps the best authority for the rule we now apply to the ascertainment of liability under the Copyright Act is the earliest pertinent decision found. It is the classic case of the Chimney Sweep's Boy,[10] which furnished the inspiration for the commentary quoted above from Smith's Leading Cases. That case concerned a young chimney sweep who found a piece of jewelry which he took to a goldsmith shop for an appraisal. The goldsmith removed the stones from the setting and offered to pay the boy three halfpence for the gems, which the boy refused, demanding return of the jewel. Later the goldsmith returned the setting but kept the stones. In an action in trover against the goldsmith, the court was confronted with essentially the same problem now before this court, namely, ascertainment of an unknown value where all information on that issue was within the control of the wrongdoer as a result of his own deliberate acts. The solution found by the court was to place all the burden and all risk of error on the wrongdoer. In laying down this rule, the report states:

"As to the value of the jewel several of the trade were examined to prove what a jewel of the finest water that would fit the socket would be worth; and the Chief Justice [Pratt] directed the jury, that un-

less the defendant did produce the jewel, and shew it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages, which they accordingly did."

Armory v. Delamirie is apposite here not only because of the similar conduct on the part of the defendant but also because of the plaintiff's resort to expert opinion testimony, which testimony was necessarily hypothetical and to a degree speculative and uncertain. Apart from the plain provisions of § 1(e), the rule of the Chimney Sweep's case suggests how ancient is the authority and basis for the rule we now enunciate for the ascertainment of royalties under the Copyright Act. In the case before us one party or the other must suffer possible injury because of the lack of evidence on which an accurate award can be based. The possibility of such injury must fall upon either the copyright owners or upon the infringers. That our resolution of this choice involves the risk of a determination lacking in mathematical accuracy is a consequence defendants have brought on themselves.

■ We hold (1) that the statute imposes on the defendants an obligation to keep production records to fulfill the duty to make sworn monthly reports to the copyright owner upon request; (2) that the defendants have frustrated the proof of the amount of liability, either by failing to disclose facts reasonably known to them or by failing to keep accurate production records; (3) that in these circumstances the opinion of the expert Berman should have been admitted into evidence. The trial court must be allowed wide discretion in receiving evidence, whether by way of expert opinion or otherwise, where defendants have availed themselves of the benefits of the Act but have failed to comply with its burdens; all doubts and uncertainties as to the volume of the unknown production

10. Armory v. Delamirie, 1 Strange 505, 93 Eng.Rep. 664 (1722).

should be resolved strictly against the defendants.

In this case the foundation for asking the hypothetical question of the expert could probably have been made more complete. Nevertheless we leave to the sound discretion of the District Court whether it will accept Berman's opinion in the form it was tendered or whether the interests of justice require that the factual issue of production volume be reopened *in toto* and reconsidered in light of this opinion. The Court may presume the strongest case against him who, by his conscious, deliberate act has seemingly made accurate, direct proof of the true facts impossible. We will not permit commercial piracy to produce illegal gains immune from recovery. While the law cannot prevent all sin and wrongdoing it can take some of the profit out of it.

Finally, since the defendants have already delayed and protracted to great length this litigation, they should be kept within the strictest time limits upon remand.

Reversed and remanded for further proceedings.