**EDWARD B. MARKS MUSIC COR-
PORATION, Plaintiff-Appellant,**

v.

**COLORADO MAGNETICS, INC., d/b/a
Sound Values, Inc., et al., Defendants-
Appellees.**

No. 73–1395.

United States Court of Appeals,
Tenth Circuit.

Submitted Nov. 13, 1973.

Decided Feb. 28, 1974.

As Modified on Rehearing May 28, 1974.

Simon H. Rifkind, New York City (James D. Fellers, Frank A. Gregory, Fellers, Snider, Baggett, Blankenship & Bailey, Oklahoma City, Okl., and of counsel, John C. Taylor, III, Stuart Robinowitz, Sidney S. Rosdeitcher, Steven B. Rosenfeld, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Robert C. Osterberg, John S. Clark, Abeles, Clark & Osterberg, Charles B. Lutz, Jr., Speck, Philben & Fleig, Oklahoma City, Okl., on the brief), for plaintiff-appellant.

Jerry J. Dunlap, Oklahoma City, Okl. (Charles A. Codding, Dunlap, Laney, Hessin & Dougherty, Oklahoma City, Okl., on the brief), for defendants-appellees.

Before LEWIS, Chief Judge, and MURRAH and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a so-called tape piracy case. Edward B. Marks Music Corporation, hereinafter referred to as Marks, is an independent music publisher and, as such, is the owner of copyrights in numerous musical compositions. Marks, through its licensing agent, the Harry L. Fox Agency, Inc., has authorized various record companies to make recordings of compositions in which it, Marks, owns the copyright. The recording companies thus licensed by Marks to reproduce or record its copyrighted musical compositions have hired artists who have made recordings of the musical compositions here involved. Such recordings are then offered for sale to the general public.

Colorado Magnetics, Inc., hereinafter referred to as Magnetics, with no authorization from Marks, has also made recordings of musical compositions in which Marks owns the copyrights and has offered its recordings for sale to the general public at a price well below the retail price of the recordings produced by those recording companies licensed by Marks to record its copyrighted compositions. Magnetics' modus operandi is to first purchase on the open market individual "hit" records thus made by those recording companies licensed by Marks to use its copyrighted compositions. Magnetics then duplicates or copies the recording with its own sound equipment on magnetic tape and offers for sale to the general public its duplicated or copied cassette tape recordings. Magnetics, of course, is able to undersell because, by simply copying the records made by others, it avoids the considerable expense incurred by the licensed recording companies in the hiring of arrangers, an orchestra, and the featured recording artists incident to their recordings.

It was in this general setting that Marks brought a copyright infringement action against Magnetics, seeking damages and injunctive relief. The gist of Marks' complaint is that Magnetics is making an unauthorized and unlawful use of musical compositions in which it, Marks, owns the copyrights. Magnetics, by answer, denied copyright infringement, and alleged that its use of Marks' copyrighted compositions is authorized by the so-called "compulsory license" provisions of the Copyright Law, namely, 17 U.S.C. §§ 1(e) and 101(e). Additionally, and alternatively, Magnetics alleged that Marks was guilty of certain antitrust violations which preclude it from enforcing its copyrights.

The case was initially set down for hearing on Marks' request for a preliminary injunction. However, before such hearing was held, the parties agreed that a hearing on the merits would be combined with the hearing on the preliminary injunction. Upon trial, the only witness called was the president of Marks. Additionally, four depositions were offered, and received into evidence, the two principal owners of Magnetics having been among those thus deposed. Also, considerable documentary material was offered, and received, without objection. And this was the extent of the evidentiary matter before the trial court.

At the conclusion of the trial, the trial court asked the respective par-

ties to submit proposed findings and conclusions. Thus the parties did and the trial court elected to adopt, virtually without change, the findings and conclusions submitted by Magnetics, all of which, needless to say, resulted in a smashing victory on all fronts for Magnetics. In this regard, we note that the Supreme Court in United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), observed that findings and conclusions prepared by counsel and adopted, more or less verbatim, by a trial court are less helpful on review than findings and conclusions drawn with the "insight of a disinterested mind." We agree.

In any event, the trial court specifically found that Magnetics in its use of Marks' copyrighted musical compositions did not infringe on Marks' copyrights and that Magnetics' duplication of records playing Marks' copyrighted compositions was authorized by the compulsory license provisions of 17 U.S.C. §§ 1(e) and 101(e). Alternatively, and additionally, the trial court went on to find that Marks was guilty of certain antitrust violations which precluded recovery; that because of its "misuse" of the copyrights in question Marks was estopped; and that Marks' "unclean hands" also barred recovery. In line with such findings and conclusions, the trial court dismissed the proceedings and awarded Magnetics its costs and attorneys' fees. The complete findings and conclusions of the trial court are reported in Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 357 F.Supp. 280 (W.D.Okl.1973). In this regard, we note that though the trial court made written findings and conclusions, it did not render, as such, an opinion. From such judgment Marks now appeals. We reverse.

## COMPULSORY LICENSE

In our view, the central issue in this case relates to the compulsory license provisions of 17 U.S.C. §§ 1(e) and 101(e). If Magnetics' use of Marks' copyrighted compositions falls within the ambit of that particular statutory provision, then Marks' present action must fail. However, if Magnetics' activities are outside the bounds of that statute, then Marks, as the copyright owner, is entitled to relief.

Although prior to 1909 a composer could obtain a copyright on his musical composition, Congress in 1909 considerably extended the copyright interest of the composer to the end that thereafter the copyright owner of a musical composition could himself control the mechanical reproduction of his composition.[1] At the same time, fearful that by permitting a musical composition to be thus copyrighted it was permitting an absolute monopoly,[2] Congress tacked on a proviso or exception to the statute authorizing the copyrighting of musical compositions. It is this proviso, which is a part of 17 U.S.C. § 1(e), with which we are here concerned. Such proviso reads as follows:

Provided, . . . as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the

---

1. Act of March 4, 1909, Pub.L.No.349, Chap. 320, 35 Stat. 1075; codified at 17 U.S.C. § 1(e). Congress felt this extension to have been necessary because the Supreme Court had held that perforated piano rolls and records were not "copies" of the composition which they reproduced. White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908). See 43 Cong.Rec. 3765–3767 (Mar. 3, 1909).

2. See H.R.Rep.No.2222, 60th Cong., 2d Sess. 7–8 (1909); Shapiro, Bernstein & Co., Inc. v. Remington Records, Inc., 265 F.2d 263 (2d Cir. 1959). However, it has been suggested that the breadth of the contemporary record industry belies any concern over monopolistic power. Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess. (H.R.Comm. Print 1961).

copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; . . . .

█ As indicated, Magnetics claims that its use of Marks' copyrighted composition in its duplication of records made by others is authorized by the foregoing statutory provision, which provides for a so-called compulsory license, in lieu of an express license from the copyright owner. In this general regard, it should be noted that Magnetics did file a notice of intent as required by 17 U.S.C. § 101(e) and did make a tender, of sorts, of the 2 cent royalty called for in 17 U.S.C. § 1(e). Marks refused the tender, and then instituted the present proceeding. We need not here concern ourselves with whether the tender complied with the statute, as, in our view, Magnetics' use of Marks' copyrighted compositions necessarily involved in its duplication or copying of the records of others, who are themselves licensed by Marks to record, finds no sanction in 17 U.S.C. § 1(e).

██ At the outset, we note that we are here concerned with a proviso or exception to the statute vesting a copyright interest in the composer of a musical composition and granting him the exclusive right to determine the use to be made of his copyrighted composition. In this regard, it is the general rule that a proviso should be strictly construed to the end that an exception does not devour the general policy which a law may embody. Shilkret v. Musicraft Records, Inc., 131 F.2d 929 (2d Cir. 1942), cert. denied, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699 (1943).[3]

█ As we read the statutory provisions here under consideration, one who owns the copyright in a musical composition has, in the first instance at least, absolute control over who records his composition. He may elect not to allow anyone to record his composition. However, when the composer elects to license another to "use . . . the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work," then the compulsory license provisions of the statute may be invoked. Specifically, the statute provides that once the composer has licensed another to reproduce by recording the composer's composition, then, upon payment of the statutory royalty, " . . . any other person may make similar use of the copyrighted work . . . . " This means, to us, that one who complies with royalty payment called for by the statute, though not having any authorization from the copyright owner, may nonetheless then "use," not a third party's record, but the copyrighted composition, which has been characterized as the "raw material," in a manner "similar" to that employed by the recording company which did have authorization from the copyright owner. There is, of course, nothing in the statute which affirmatively authorizes Magnetics to duplicate and copy the recording of one licensed by the copyright owner to reproduce his composition. However, under the statute Magnetics may "use" the copyrighted composition in a manner "similar" to that made by the licensed recording company. All of which means, to us, that Magnetics may make its own arrangements, hire its own musicians and artists, and then record. It does not mean that Magnetics may use the composer's copyrighted work by duplicating and copying the record of a licensed recording company. Such, in our view, is not a *similar* use.

In thus construing the statute, we believe that the legislative history of these particular statutory provisions, from 1909 down to the amendments enacted in 1971, is conflicting and indecisive. More will be said later about the 1971

---

3. Nor will we at the same time permit such a general policy to be obscured by "drastic technological changes" that have arisen since the enactment of the statute. Fortnightly

Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968).

amendment. We further are aware that the decisions of the several federal district courts which have been faced with this particular question are in conflict. *See*, for example, Fame Publishing Co., Inc. v. S & S Distributors, Inc., 363 F. Supp. 984 (N.D.Ala.1973), where that court held that a compulsory licensee under 17 U.S.C. § 1(e) acquired no right to duplicate or copy the recordings of another and that one who seeks to rely on the compulsory license provisions of 17 U.S.C. § 1(e) "must hire some musicians, take them into a studio and make his own recording." For a contrary view, *see* Jondora Music Publishing Co. v. Melody Recordings, Inc., 351 F.Supp. 572 (D.N.J.1972), where that court held that the Copyright Act of 1909 did *not* grant to the musical composition copyright holder the power to prevent third persons from copying a particular performance of his composition where (a) with the copyright holder's permission a performance has already been fixed on a physical object capable of reproducing it, and (b) the third person has complied with the compulsory license provisions of the Act by filing and serving notices of intention and paying statutory royalties to the copyright owner.

The only Circuit Court faced with this precise problem is the Ninth. Duchess Music Corporation v. Stern, 458 F.2d 1305 (9th Cir. 1972), pet. for rehearing and rehearing en banc denied, April 26, 1972, *cert. denied,* 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), about which more will be said later. And of course the Supreme Court has not yet passed on this particular issue. In our view, the recent case of Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L. Ed.2d 163 (1973), is not decisive of the present appeal. In *Goldstein,* the Court was concerned with the relationship between federal copyright law prior to the 1971 amendments and a California statute prohibiting the "piracy" of sound recordings by copying without permission of the recording company. The nature and extent of the interest of one

having a copyright in a musical composition was not there considered.

As indicated, the Ninth Circuit has considered the meaning of 17 U.S.C. § 1(e). Duchess Music Corporation v. Stern, *supra.* There was a strong dissent in *Duchess.* So, the majority opinion and the dissent in *Duchess* represent quite well the competing points of view on the meaning of 17 U.S.C. § 1(e). In *Duchess,* the majority held that the phrase "similar use" within the meaning of the Act of 1909 does not include the "right to copy" the recordings of others. We agree and are generally persuaded that the majority opinion in *Duchess* sets forth the proper interpretation of the statute.

▇ As above indicated, in 1971 Congress amended the Copyright Law by making it possible for the first time to copyright the sound recording of a copyrighted composition, the effective date of this amendment being February 15, 1972. It is suggested that such amendment irrefutably indicates that Congress in 1971, at least, was of the view that the duplication or copying of sound recordings made prior to February 15, 1972, was lawful and in nowise inhibited by the Act of 1909. We do not think that such necessarily follows.

▇▇ In the first place, we are of course not bound by Congress' interpretation of a prior existing law. Golsen v. C. I. R., 445 F.2d 985 (10th Cir. 1971), cert. denied, 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971). Indeed, whatever merit there may be in the practice of relying on the opinion of a later Congress as to the intent of an earlier one wanes with the length of time which separates the two sessions, which in the instant case was sixty-three years. United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). For an indication of the interpretation given the Act of 1909 by the judiciary shortly after its enactment, see Aeolian Co. v. Royal Music Roll Co., 196 F. 926 (W.D.N.Y.1912).

In that case, it was held that § 1(e) of the Act providing that "any other person may make similar use of the copyrighted work" did not thereby secure the right to a subsequent user to "copy" the perforated piano rolls or records of another. The court then went on to declare that the would-be subsequent user could not avail himself of the skill and labor of the original manufacturer of the perforated roll or record by copying or duplicating the same, but had to resort to the copyrighted composition, and could not "pirate the work of a competitor who has made an original perforated roll."

Secondly, the 1971 amendment created a copyrightable interest in the recording itself, the amendment to be effective February 15, 1972. We are here concerned with the nature and extent of the copyright interest of the composer, not the recording company. Such distinction we believe to be fundamental. Accordingly, we are not here concerned, as such, with the record, and its copying, but with the original composition and the copyright interest therein. This distinction we believe was indicated by us in Tape Head Company v. R. C. A. Corporation, 452 F.2d 816 (10th Cir. 1971). There, it was suggested by counsel that the 1971 amendment manifested an intention to grant persons situated as is Magnetics in the instant case a "carte blanche" to copy records made prior to February 15, 1972, free from any restriction, which in that case referred to state restrictions. In this general connection, however, we went on to say in Tape Head that "it is highly questionable from the authorities presented that the plaintiffs have, as a result of the Act of Congress, acquired a right to convert and use these recordings with impunity prior to February 15, 1972." It is on this basis, then, that we are of the view that the 1971 amendment does not control the instant controversy.

## ANTITRUST

As indicated, the trial court found, alternatively, that even if Marks had the right to maintain an infringement action, it was barred from obtaining any relief because of its own misconduct, particularly as concerns alleged antitrust violations. Assuming *arguendo* that an antitrust violation is a defense in a copyright infringement action, the record made in the trial court simply does not support its findings and conclusions. The evidentiary matter on this phase of the controversy is just too sketchy to support the trial court's drastic and far-reaching findings of antitrust violations. Only certain aspects of this particular phase of the case need comment.

One finding of the trial court was that Marks was precluded from any recovery because it, along with the Harry L. Fox Agency, Inc., and others, had conspired to bring the present proceeding in an effort to stifle competition. This particular finding is pretty well undermined by the interpretation we have above given 17 U.S.C. § 1(e). In any event, in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), it was held that groups with common interests may, without violating the antitrust laws, use federal agencies and the courts to advocate their causes respecting resolution of their business and economic interests as opposed to their competitors. We recognize that in *Trucking Unlimited* the case was remanded to the trial court for, among other purposes, a factual determination as to whether the resort to the California regulatory agency was but a "mere sham" within the meaning of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In the instant case, however, any suggestion of sham or bad faith on the part of Marks disappears in view of our determination that Marks in fact and in law has an enforceable copyright interest in its compositions. So, as we said in Semke v. Enid Automobile Dealers Ass'n., 456 F.2d 1361 (10th Cir. 1972), the utilization of the courts in a manner which is

in accordance with the spirit of the law continues to be exempt from the antitrust laws. *See also* Alberto-Culver Company v. Andrea Dumon, Inc., 466 F. 2d 705 (7th Cir. 1972), where it was held that a good faith effort to enforce one's copyright is not the type of exclusionary conduct condemned by § 2 of the Sherman Act.

The trial court also found that Marks was estopped from obtaining relief because of its misuse of its copyrights as concerns its pricing policies and the like. In this regard, it is argued that Ampex, for example, is a compulsory licensee and is duplicating and copying records in a manner similar to Magnetics. We do not agree that Magnetics is in a similar position to that of Ampex. Ampex has been duplicating and copying, not the recordings of the licensed recording companies, but the master tapes of the recording companies, all with the latter's permission and for a fee and with the consent of Marks, the copyright owner. *See* in this latter regard Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637 (10th Cir. 1973), where we recognized the right of a manufacturer to select the customers to whom he will sell so long as his conduct has no monopolistic or market control purposes.

Permeating the entire "antitrust" argument of Magnetics is the belief that Marks comes into court with unclean hands to the end that it is precluded from obtaining equitable relief. The record in our view does not support this position. In this regard, the following language from Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99 (2d Cir. 1951), is deemed appropriate:

. . . We have here a conflict of policies: (a) that of preventing piracy of copyrighted matter and (b) that of enforcing the antitrust laws. We must balance the two, taking into account the comparative innocence or guilt of the parties, the moral character of their respective acts, the extent of the harm to the public interest, the penalty inflicted on the plaintiff if we deny it relief. As the defendants' piracy is unmistakably clear, while the plaintiffs' infraction of the antitrust laws is doubtful and at most marginal, we think the enforcement of the first policy should outweigh enforcement of the second.

In this same general connection, *see also* Hoehn v. Crews, 144 F.2d 665 (10th Cir. 1944), *aff'd sub nom,* Garber v. Crews, 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870 (1945), where it was noted that it is not required that one who would seek equity must himself possess "spotless hands" and that it is not "every stain" that will bar one from equitable relief.

Applying the rationale of such cases as *Alfred Bell & Co.* and *Hoehn,* we conclude that Marks is not precluded from relief because of any possible misconduct on its part. The long and short of this entire matter is that Marks owns a copyright to certain musical compositions and Magnetics seeks to use Marks' property right without Marks' consent and, in our view, in a manner not authorized by the compulsory license provisions of 17 U.S.C. § 1(e).

As is reflected in the trial court's decision in Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., *supra,* the "issue of liability" was separated for trial purposes. On the record before it, the trial court erred in entering judgment for Magnetics. Under the circumstances, it should have entered judgment for Marks. Accordingly, the judgment of the trial court is hereby reversed and the cause remanded with directions that it enter judgment for Marks on the "issue of liability." Subsequent proceedings to determine the relief to which Marks is entitled should be consonant with the views herein expressed.

LEWIS, Chief Judge (dissenting):

I am in complete accord with the views of Judge Lacey set forth in Jondora Music Publishing Co. v. Melody Recordings, Inc., D.C.N.J., 351 F.Supp. 572, and of Judge Byrne, dissenting in Duchess Music Corp. v. Stern, 9 Cir., 458 F.2d 1305, cert. denied, 409 U.S.

847, 93 S.Ct. 52, 34 L.Ed.2d 88. A similar conclusion has recently been reached by a Wisconsin state court. *See* Mercury Recording Productions, Inc. v. Economic Consultants, Inc., 42 L.W. 2406 (Wis.Cir.Ct. Feb. 12, 1974). I would affirm on this aspect of the case only.

## ON REHEARING EN BANC

Judge MURRAH, a member of the three-judge panel which first heard this case, recuses on rehearing en banc. Judge McWILLIAMS, upon rehearing en banc, adheres to the majority opinion as heretofore filed on February 28, 1974, and Judges HILL, SETH, BARRETT and DOYLE now concur in that opinion. Chief Judge LEWIS, on rehearing en banc, adheres to his dissent, and Judge HOLLOWAY now joins in that dissent.