**UNITED STATES of America,**

v.

**Robert M. WEICHERT, Defendant.**

**No. 84–CR–139.**

United States District Court,
S.D. New York.

Aug. 16, 1988.

Frederick J. Scullin, Jr., U.S. Atty. for the N.D. New York, Syracuse, N.Y., for U.S.; by William H. Pease, Asst. U.S. Atty.

## OPINION

MacMAHON, District Judge.[*]

Defendant was convicted on May 31, 1985, following a three-day jury trial at Auburn, N.Y., on one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 1), and four substantive counts of bankruptcy fraud, in violation of 18 U.S.C. § 152 (Counts 3, 4, 5 and 6). His conviction was affirmed in all respects. *United States v. Weichert*, 783 F.2d 23 (2d Cir.), *cert. denied*, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986).

Defendant was sentenced on August 15, 1985 to three years' imprisonment and fined $5,000.00 on each of Counts 1, 3 and 4, the prison sentences and fines to run concurrently with each other, and to five years' imprisonment on each of Counts 5 and 6, to run concurrently with each other but consecutively to the prison sentences imposed on Counts 1, 3 and 4. Execution of the prison sentences imposed on Counts 5 and 6 was suspended, and defendant was placed on probation for a period of five years, to commence upon expiration of the prison sentences imposed on Counts 1, 3 and 4, and on the condition that he make restitution "in the amount of $200,000.00 or such other sum and on such terms as the Probation Officer of this District shall determine." (*See* Judgment and Probation/Commitment Order of August 15, 1985.)

Later, defendant's appeal from our denial of motions for reduction of sentence, pursuant to Rules 32 and 35, Fed.R. Crim.P., resulted in a remand of the motions with direction to hold a hearing to determine, pursuant to 18 U.S.C. § 3651, the "actual damages or loss caused by ... [defendant's] conviction ... [for bankruptcy fraud]," *United States v. Weichert*, 836 F.2d 769, 772 (2d Cir.1988), and, thereafter,

Edward F. Gerber, Syracuse, N.Y., for defendant.

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

to make an appropriate finding and order of restitution.

The mandated hearing was held on May 11 and 12, 1988, and six witnesses, including defendant, testified, and fifteen exhibits were received in evidence. Thereafter, counsel for both parties submitted briefs in support of their respective positions, and we heard oral argument on June 10, 1988.[1]

■ The standard of proof on a hearing for restitution, although not specified under 18 U.S.C. § 3651, is "preponderance of the evidence." *United States v. Hill*, 798 F.2d 402, 405 (10th Cir.1986). After carefully considering the exhibits; hearing and observing the witnesses; weighing all of the evidence and arguments of counsel; and bearing in mind that it is not the quantity, but the quality, of the evidence which is ultimately determinative, we find the following facts and make the following conclusions of law:

The illegal transactions which resulted in defendant's indictment and ultimate conviction involved, to varying degrees, defendant; his business partner, Ivan T. Preslar ("Preslar"); and four corporate entities known as Timberline Energy Corporation ("Energy"), Timberline Stoves Northeast, Inc. ("Northeast"), Timberline East, Inc. ("East"), and Adirondack Wood Stove Works, Inc. ("AWW").

Preslar owned and operated Energy, which was engaged in the business of manufacturing wood stoves on premises located at 1840 LeMoyne Avenue, Syracuse, N.Y. In April 1981, Energy filed for bankruptcy, and Preslar transferred raw materials, equipment, employee payroll records, and other business records to Northeast, a company which he also owned and operated at 1840 LeMoyne Avenue in Syracuse.[2] This transfer, made without approval of the bankruptcy court, effectively substituted Northeast for Energy in future dealings with customers and was the first known instance of fraudulent activity.

The testimony of Virginia Grevelding ("Grevelding"), an officer of both Energy and Northeast, establishes that defendant had no managerial control over either of these corporations during the period April through August 1981, and that he was nothing more than a customer of both corporations during that period.[3] Defendant's first involvement with these companies, other than as a customer, began on August 24, 1981, when he held a meeting at the 1840 LeMoyne Avenue location to announce to Energy/Northeast employees that a new corporation, East, would be formed under his management.[4] The following day, August 25, 1981, an account, in the name of East and under defendant's control, was opened with Key Bank.[5] Thereafter, all monies received at 1840 LeMoyne Avenue, whether payable to Energy, Northeast, or East, were deposited into this newly-opened account.[6] The bankruptcy court eventually ordered the shutdown of Energy, the only one of these corporations in bankruptcy, and on September 10, 1981, federal marshals padlocked the premises at 1840 LeMoyne Avenue.

During the weeks immediately prior to the court-ordered shutdown, large amounts of raw materials, stoves, and office equipment were sold or otherwise disposed of by defendant and his partner, Preslar, through Energy/Northeast/East.[7] Grevelding tes-

---

1. The court thanks Edward F. Gerber, Esq., for his gracious acceptance of appointment as defendant's counsel and commends his thorough and exceptionally able representation in the highest traditions of the bar. We also commend him and Assistant United States Attorney William H. Pease for the cooperative, diligent, and highly professional manner in which they performed their duties in helping to unravel and clarify the complex series of transactions involved in this bankruptcy fraud.

2. *See* transcript of hearing held May 11 and 12, 1988 ("Tr. ——"), at pp. 32–36.

3. *See* Tr. 35–36.

4. *See* Tr. 41–42.

5. *See* Tr. 42–44.

6. *See* government's Hearing Exhibits 1 and 2.

7. All three companies by this time were effectively, though fraudulently, merged. Customers would pay for stoves and other purchases with checks made payable to Timberline Energy, Timberline Northeast, Timberline Stoves, and Timberline East. Nevertheless, it is clear that

tified that several dealers, including defendant, made "truckload purchases" of stoves, stove parts, and other equipment throughout the period of time immediately preceding the shutdown, and that she kept a record, on loose pieces of paper and at Preslar's direction, as to the quantity of goods received by each dealer.[8] She admitted, however, that these transactions were never entered on the books of any of the three companies.[9] She further testified that, although she could not remember the exact value of the diverted goods, it was either "$214,000.00 or $217,000.00." [10] Preslar also testified that merchandise and equipment, valued at between $210,000.00 and $220,000.00, was removed from the premises at 1840 LeMoyne Avenue.[11]

The government and defendant have stipulated that the slip of paper "records", kept according to Grevelding, were never received by the government,[12] and it is unclear what happened to them. Defendant argues that the absence of specific documentation as to the value of the diverted goods precludes the imposition of an order of restitution for their value. We disagree.

We emphasize that the evidence at trial was sufficient to establish that defendant had diverted substantial assets of Energy. The Court of Appeals has already determined that "[t]he jury was entitled to infer, from the hurried formation of Timberline East and the diversion of Timberline Energy's assets immediately prior to the ... bankruptcy proceeding ... that [defendant] intentionally defrauded Timberline Energy's creditors[.] ... Although [defendant] present[s] innocent explanations for these diversions, the verdicts must stand because, when viewed in the light most favorable to the Government, the evidence was sufficient to support them." *Weichert, supra,* 783 F.2d at 25. Addition-

ally, Preslar testified at the hearing that he and defendant agreed to remove Energy's assets from the LeMoyne Avenue location and that they would share fifty-fifty in the proceeds from the sale of those assets.[13] In short, the evidence, both at trial and on the hearing, leaves no doubt that defendant was responsible for the diversion of a large quantity of goods and equipment belonging to Energy.

We cannot accept defendant's contention that the absence of written records concerning the quantity and precise value of the diverted goods precludes an order of restitution with respect to the value of those goods. Bankruptcy fraud, by its very nature, does not lend itself to a precise accounting. Such an accounting would be feasible only if the diversion of assets had not occurred. To forego the imposition of restitution because defendant has successfully camouflaged the amount of the loss caused by his fraud would serve to reward his wrongdoing.

Grevelding's statement that she made no book entries, coupled with her testimony that she kept this "inventory" on loose pieces of paper at Preslar's direction, permits an inference that Preslar and defendant intended that the slips be used, not as business records, but as instruments of fraud in their diversion of Energy's assets. The inference is clear that these disposable slips of paper were intended, not as an indelible record of overt sales, but as vanishing tallies of loot to be split between them. It is, therefore, more likely than not, that, after serving their fraudulent purpose, these records were destroyed in an effort to conceal the actual amount of any fraud.

Clearly, equity demands that the wrongdoer, not the victim, suffer the consequences of the wrong. As former Chief Justice Burger noted, while sitting by des-

Northeast and East were merely "shell companies" and that any capital and inventory they possessed had been fraudulently acquired from the bankrupt Energy corporation.

8. *See* Tr. 55–56.

9. *See* Tr. 18.

10. *See* Tr. 19.

11. *See* Tr. 202.

12. *See* Tr. 211–12.

13. *See* Tr. 205–207.

ignation on our Court of Appeals as a visiting Circuit Judge, in *Shapiro, Bernstein & Co. v. Remington Records, Inc.,* 265 F.2d 263, 271–72 (2d Cir.1959):

"When the nature of a wrongful act is such that it not only inflicts an injury, but takes away the means of proving the nature and extent of the loss, the law will aid a recovery against the wrongdoer and supply the deficiency of proof caused by his misconduct, *by making every reasonable intendment against him,* and in favor of the party whom he has injured. A man who wilfully placed the property of others in a situation where it cannot be recovered, *or its true amount or value ascertained,* by mixing it with his own, or in any other manner, will consequently be compelled to bear all the inconveniences of the uncertainty or confusion which he has produced, even to the extent of surrendering the whole if its parts cannot be discriminated, or responding in damages for the highest value at which the property in question can reasonably be estimated." (Quoting 1 Smith's Leading Cas. (pt. 1) 589 (6th American ed. 1866) (emphasis added).)

The principle, familiar to any law student, harks back to an early English case, known as the Chimney Sweep's Boy.[14] There, a young chimney sweep found a piece of jewelry which he took to a goldsmith for appraisal. The goldsmith removed the stones from the setting and offered to buy them. When the boy refused the offer, the goldsmith returned the setting but kept the stones. In an action in trover against the goldsmith, the court was confronted with the problem of ascertaining an unknown value where all the information on that issue was within the control of the wrongdoer. The court's solution was to place the burden and the risk of error on the wrongdoer, and the jury was instructed that it should presume the stones were of the highest value unless the defendant produced them so that their true value could be established. *Shapiro, Bernstein & Co., supra,* 265 F.2d at 272.

Here, the government has established, both during trial and upon the hearing, that defendant was responsible for the diversion of a substantial portion of approximately $214,000.00 worth of goods lost by Energy.[15] Defendant has admitted doing so, while contending that others, including Preslar, also participated in the diversion.[16] His admission, coupled with the testimony of both defendant [17] and Preslar,[18] that they were to be equal partners in East, convinces us that defendant should be required to pay restitution for the diversion of goods in an amount equal to one-half of their value, or $107,000.00.

Defendant was also convicted of having knowingly and fraudulently received a check due the bankrupt estate from the Agway corporation ("Agway check") on September 15, 1981, in the amount of $27,442.77. Defendant now argues that the Agway check was actually due to Northeast and that, therefore, no fraud was perpetrated on the bankrupt estate. We disagree.

The testimony was clear and unequivocal that all of Energy's assets were transferred to Northeast without approval by the bankruptcy court.[19] Similarly, East was later capitalized with assets from Northeast.[20] Thus, as we have indicated earlier, Northeast and East were simply "shells" for the bankrupt Energy, and the Agway check was properly due the estate of Energy. Additionally, checks totalling $21,-

---

**14.** *Armory v. Delamirie,* 1 Strange 505, 93 Eng. Rep. 664 (1722).

**15.** Grevelding testified that the value of the diverted goods was $214,000.00 or $217,000.00, although she could not remember the exact figure (*see* Tr. 19). Preslar testified that their value was "above $210,000.00 and ... below $220,000.00" and guessed it was about $214,-000.00 (*see* Tr. 202). In all likelihood, therefore, the $214,000.00 figure is as close to the actual value of the diverted goods as can reasonably be determined from the evidence.

**16.** *See* Tr. 228–30.

**17.** *See* Tr. 275.

**18.** *See* Tr. 205–206.

**19.** *See* Tr. 29–33.

**20.** *See* Tr. 46–47.

513.87 and made payable to such companies as Timberline Energy, Timberline Stoves, Timberline, Timberline Stores, Timberline Stoves Northeast, and Timberline East were received by East after August 25, 1981 and deposited by defendant to East's account at Key Bank. These were all monies due the bankrupt estate of Energy but unwittingly paid to East by customers.

■ In imposing restitution, we need not accept a fixed, arbitrary limit where an amount larger than that specified in the indictment "is established by proof at trial, or by some other judicial determination or consensual means." *United States v. Gallup*, 812 F.2d 1271, 1282 (10th Cir.1987). We find the "actual damages or loss caused by ... [defendant's] conviction ... [for bankruptcy fraud]," *Weichert, supra,* 836 F.2d at 772, to be $155,956.64.[21]

Accordingly, the Clerk of the court is directed to enter an amended judgment reducing the amount of restitution to be paid by defendant from $200,000.00 to $155,-956.64.

SO ORDERED.

---

**21.** This amount represents $107,000.00 in diverted goods and equipment, the Agway check for $27,442.77 and $21,513.87 fraudulently received in the form of 31 other checks properly due Energy (*see* government's Hearing Exhibits 1 and 2).