## UNITED STATES of America

v.

### Elizabeth Jean MACK.

### Crim. No. 1–81–5.

United States District Court,
N. D. Texas,
Abilene Division.

Oct. 16, 1981.

John Saringer, Abilene, Tex., for plaintiff.

Jimmy L. Tallant, Asst. U. S. Atty., Fort Worth, Tex., for defendant.

### ORDER GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 1 AND 2

SUTTLE, Senior District Judge.

The defendant, an employee of the First State Bank of Abilene, Texas, was originally charged in a four-count indictment accusing her of embezzling funds of the bank. During the trial, by agreement of the parties, the government agreed to dismiss Counts 3 and 4 of the indictment. Subsequently, the jury convicted the defendant on Counts 1 and 2. Pending is the defendant's motion for judgment of acquittal, made at the close of all the evidence and carried by the court pursuant to Rule 29(b), F.R.Cr.P. For the following reasons, the court will grant the defendant's motion.

To understand the scheme concocted by the defendant, it is necessary to understand the following procedures employed at the bank.

When a bank customer deposits a check to his account, the teller accumulates the check in a pile, along with a deposit slip that denotes the amount and the account to be credited. When a customer cashes a check, the teller accumulates the check in the pile, along with a "cash-out" ticket in the amount of the check. Similarly, when a customer makes a cash withdrawal from his account, the teller accumulates a withdrawal slip and a "cash-out" ticket in the amount of the withdrawal.

When the teller has accumulated a batch of checks, deposit slips, withdrawal slips, and "cash-out" tickets, he rubber bands them and puts them into a tray. Utilizing this procedure, the amount of the "credit" items equals the amount of the "debit" items in each rubber-banded batch.

Periodically, a runner stops at the teller's cage and picks up the batches of work in the tray. The runners carry the batches of work to a preparation desk. Employees at the preparation desk make sure that all the

documents in each batch are facing in the same direction, so that they can be run through a proofing machine.

From the preparation desk, the batches of work go to the proofing department. There, proofing operators process the batches through proofing machines. A proofing machine imprints the checks, slips, and tickets in their face amount with micro-ink on the front lower-right-hand corner of the instruments. The proofing machine simultaneously imprints the bank's endorsement on the back of the instruments. The proofing machine also totals up the amount of the "credit" and "debit" items in each batch; and the operator monitors each batch to make sure that the totals equal each other—that is, that the batch balances out.

After proofing, batches of instruments are microfilmed, combined, and put through a high-speed sorter. Besides separating documents, the sorter totals the debits and credits in the combined batches. If all the component batches balanced in proofing, the combination should balance, unless a document or documents have been added or removed.

Viewed in the light most favorable to the government and with the assumption that all relevant credibility choices were made in favor of the government,[1] the evidence in this case shows that the defendant concocted the following scheme.

The defendant was an operator in the proofing department. Teary Haynes was a friend of the defendant who was employed as a runner and "prepper."

The defendant would proof a batch of documents that came to her in the course of her work. After proofing the batch and finding it balanced, she would remove a check that a bank customer had either cashed or deposited to his account. However, the defendant would leave in the batch the deposit slip or "cash-out" ticket corresponding to that check.

Let us say that the face amount of the check was for "x" dollars. When this batch was combined with other batches to go through the high-speed sorter, due to the absence of the check, the combined batch was put out of balance by "x" dollars. However, since any deposit slip remained, the customer's account was properly credited with any amount it should have been. In effect, the bank's books were thrown off by an amount of "x" dollars for that day's transactions. The bank would debit this loss to a "transit suspense" account.

Later on the same day or the next day, the defendant would go to a teller at the bank and either (1) cash a check for "x" dollars on her checking account or (2) make a withdrawal of "x" dollars from her savings account. Sometimes, both the defendant and Teary Haynes would cash checks totaling "x" dollars on their own individual accounts. Knowing the defendant (and Teary Haynes), the tellers would not check the defendant's (or Teary Haynes') account and find that the funds in it were insufficient to cover the checks and/or withdrawals.

Teary Haynes, as a runner, would pick up the batch or batches of documents evidencing these transactions; and Haynes would bring these batches to the defendant for proofing. However, before proofing the batches, the defendant would destroy either (1) the check for "x" dollars on her checking account, (2) the withdrawal slip for "x" dollars on her savings account, or (3) the checks totaling "x" dollars on both her and Haynes' individual accounts. In place of the destroyed instrument or instruments, the defendant would insert into the batch the customer's check for "x" dollars that she had previously removed from banking channels.[2] The customer's check would

---

1. *See Glasser v. United States*, 315 U.S. 60, 79, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Welch*, 656 F.2d 1039, at 1044 (5th Cir., 1981).

2. The evidence with respect to Count 1 shows that on July 29, 1980, the defendant made a withdrawal of $600.00 from her savings account and cashed a check for $233.17 on her checking account. Neither of these amounts were debited from her accounts. The evidence

now be reproofed; consequently, it would be re-imprinted with its face amount on front and with the bank's endorsement on back. And this particular batch of documents would balance out throughout the remainder of the processing.[3]

 Title 18 U.S.C. § 656 reads in relevant part as follows:

> Whoever, being an . . . employee of [any bank the deposits of which are insured by the Federal Deposit Insurance Corporation], embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such . . . employee . . .

shall be guilty of an offense against the United States. Each of the four counts of the indictment in this case charged that the defendant,

> being an employee of the First State Bank, Abilene, Texas, an insured bank the deposits of which were then insured by the Federal Deposit Insurance Corporation, with intent to injure and defraud said Bank, wilfully and knowingly did embezzle and convert to her own use the sum of approximately [sum] of the moneys, funds, and credits of such Bank which had come into her possession and under her care by virtue of her position as such employee.

In other words, the indictment merely alleged embezzling; it was not framed in the conjunctive to allege embezzling, abstracting, purloining, and willfully misapplying. The defendant contends, and this court agrees, that there was a fatal variance between the proof offered and the offenses charged.

In the court's view this case is controlled by *United States v. Sayklay*, 542 F.2d 942 (5th Cir. 1976). The facts in *Sayklay* were as follows:

> . . . The defendant was a bookkeeper at the Bank of El Paso in El Paso, Texas. As such she had access to other bank employees' account numbers, to a check-encoding machine, and to blank counter checks. This she employed to acquire blank counter checks and encode other employees' account numbers on them. She then cashed the encoded checks through a teller. Knowing that the teller would verify only the accounts' status, not the owner of the accounts, she signed her own name to the checks. When they arrived at the bookkeeping department, the defendant destroyed them. Inevitably, one of the employee-victims of the siphoning noticed the discrepancy. Her report provoked an investigation that led to the defendant. [Footnote omitted.]

*Id.*, at 943. The Fifth Circuit found that the defendant was entitled to an acquittal

> because the facts clearly show a violation of 18 U.S.C. § 656 (1970) in that the defendant *willfully misapplied* the moneys, funds and credit of the bank. She did not, however, *embezzle* the bank's funds, and this is the offense of which she has been convicted.

*Id.*, at 943.

The only distinction between this case and *United States v. Sayklay* is that Sayklay cashed checks on the accounts of other bank employees rather than on her own account. The court does not view this as a meaningful distinction.

The term "embezzlement" is a technical term imbued with a specific meaning. *Id.*, at 944; *Williamson v. United States*, 332

---

shows that she replaced her withdrawal slip with a customer's check for $600.00 (Exhibit # 1) and that she replaced her check with a customer's check for $233.17 (Exhibit # 2).

The evidence with respect to Count 2 shows that on August 1, 1980, the defendant cashed a check for $744.65 on her checking account and Teary Haynes cashed three checks totaling $744.65 on her checking account. None of these items were debited from either of the

accounts. The evidence shows that the defendant replaced all four of these checks with a customer's check for $1,489.30 (Exhibit # 3).

**3.** To cover her scheme, the defendant would remove the customer's check after it was reproofed, so that it would not be microfilmed. After the batch was microfilmed, the defendant would re-insert the customer's check before the batch went to the high-speed sorter.

F.2d 123, 133 n. 15 (5th Cir. 1964), *on appeal after retrial*, 365 F.2d 12 (5th Cir. 1966); *United States v. Holmes*, 611 F.2d 329, 331 (10th Cir. 1979). In its charge to the jury, this court defined the term in the following way:

> To "embezzle" means willfully to take, or convert to one's own use, the property of another, which came into the wrong-doer's possession lawfully, by virtue of her office or employment or position of trust. So, for a bank employee to embezzle moneys, funds, or credits of a bank, it must appear beyond a reasonable doubt from the evidence in the case that the moneys, funds, or credits came into the possession of the employee by virtue of her office or employment or position of trust with the bank, and were, while so possessed by her, willfully applied or converted to her own use.

*See* Devitt & Blackmar: *Federal Jury Practice and Instructions*, § 50.03 (3d ed. 1977).

Like *Sayklay*, this is a case where the defendant misapplied bank funds but did not embezzle them. When the defendant cashed a check or made a withdrawal at a teller's cage, she was acting as a customer of the bank. The funds "were not entrusted to her in any capacity whatever for the use and benefit of the bank." *Id.*, at 944. In addition, the defendant received the funds with the previously formed intention of preventing her accounts from being correctly debited. Thus, the defendant's initial possession of the funds was not "lawful." *Id.*, at 944; *United States v. Trevino*, 491 F.2d 74, 75 (5th Cir. 1974) ("There is a difference between the crimes of embezzlement and stealing. The crimes are inconsistent. Embezzlement presupposes lawful possession and theft does not."); *Williams v. United States*, 208 F.2d 447, 450 (5th Cir. 1953), *cert. denied*, 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954) (". . . [T]here can be no doubt that the Government's propeller was stolen and not embezzled since it affirmatively appears that at the time Tanksley came into possession of the propeller he had the previously formed intention of appropriating it to his own use and that of his confederates.").

The government attempts to distinguish this case from *United States v. Sayklay* by arguing that the checks Sayklay drew on the accounts of fellow employees were worthless forgeries, whereas the checks the defendant drew on her own account were not. The government argues as follows:

> . . . The defendant's checks and withdrawal slip would be evidence of a debt due by the defendant to the bank and would authorize the bank to credit [sic] her accounts to the extent of her account balances and to collect the balance through withholding from her salary, adding the amount of the overdraft to a loan account or some other such action to collect the amount owed on the checks. Therefore, it is the government's position that the embezzlement charged in the indictment occurred when the defendant removed her checks and savings account withdrawal slip from the bank's processing procedure, thereby preventing the bank from utilizing one or more of the foregoing alternatives to collect its loss.

*Government's Response to Defendant Mack's Memorandum of Law in Support of Motion for Judgment of Acquittal*, at p. 7.

The government's argument overlooks the fact that the defendant had come into possession of the funds before she removed her check and/or withdrawal slip from banking channels; and she had come into possession of the funds as a customer of the bank—not as an employee. The defendant used her position as employee to cover up the fact that she had received funds as a customer. She caused her check and/or withdrawal slip to come to her through bank channels so that she could destroy them; however, the destruction of these "evidences of indebtedness" was not the end—only the means to the end. By this time the defendant already had the funds in hand.

■ In addition, the government's argument overlooks the fact that the defendant acted to obtain possession of the "evidences of indebtedness" only after she had already formed the intent to steal. Since she

caused the "evidences of indebtedness" to come into her possession with this previously formed intent, her actions in removing them cannot be characterized as embezzling. *See Williams v. United States, supra; Navarro v. United States*, 218 F.2d 360, 361 n. 1 (5th Cir. 1955) ("[In *Williams v. United States*] we held that the act of a federal employee to obtain possession initially of specific property which otherwise would not have come into his possession, made his wrongful disposition thereof theft and not embezzlement, where he acted to obtain possession after forming the intent to steal.").

It is clear that "misapplication covers acts not covered by embezzlement." *Williamson v. United States, supra*, 332 F.2d at 133 n. 15; *United States v. Sayklay, supra; United States v. Holmes, supra*, 611 F.2d at 331 ("The crime of willful misapplication does not require previous lawful possession."). In *United States v. Duncan*, 598 F.2d 839 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), the Fourth Circuit approved the following trial court instruction giving examples of the offense of misapplication:

A misapplication is an unauthorized, unjustifiable, or wrongful use of bank's moneys, funds, credits, assets, or securities. A misapplication may be accomplished by various means, such as . . . by allowing the use of checks or debits to accounts backed by insufficient funds which act is consistently done or concealed, or by the writing of checks by one knowing at the time that such checks will be and are paid out of the bank's funds and not from one's personal account. *Id.*, at 861–62. *See* also *United States v. Christo*, 614 F.2d 486, 493 (5th Cir.), *rehearing en banc denied*, 618 F.2d 1390 (5th Cir. 1980) ("Willful misapplication has been found . . . when a bank employee paid money out to a customer on a check he knew was backed by insufficient funds and then concealed the overdraft. . . .").

Although the evidence does not show embezzlement, it is sufficient to show misapplication. *United States v. Sayklay, supra;*

*United States v. Holmes, supra* (where proofing operator set up a fictitious account and credited it with funds and the funds were withdrawn by an accomplice, the facts showed a misapplication but not an embezzlement); *United States v. Duncan, supra* (where bank president wrote checks on his personal account knowing that they would not be debited from his account but held in the bookkeeping department, removing these sums from procedures designed to permit ongoing auditing, he was guilty of misapplication).

Unfortunately, Justice Gee's language in *United States v. Sayklay, supra*, rings all too true in this case:

. . . To uphold a conviction for embezzlement under these facts would confuse the distinction that Congress clearly drew between embezzlement and other forms of conversion. . . . More is at stake here than convicting a wrongdoer of *something*: fidelity to Congress' clear purpose and refusal to convict anyone of a crime of which he has not been—and cannot be, on the facts—proved guilty. The essence of embezzlement lies in breach of a fiduciary relationship deriving from the entrustment of money. In this case the defendant's position at the bank aided her in her crime, but it did not place her in lawful possession of others' funds that she converted to her own use. This is a hard case, but the bad law (if such it be) was made when Congress chose to carry forward the technical and antediluvian elements by which the Supreme Court long ago distinguished embezzlement from similar crimes.

*Id.*, at 944.

Accordingly, the defendant's motion for judgment of acquittal on Counts 1 and 2 is granted. The government may, of course, appeal, *United States v. Black*, 644 F.2d 445 (5th Cir. 1981), and the court encourages it to do so.