**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William  GOODSTEIN,
Defendant–Appellant.**

No. 88–1377.

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1989.

Decided Sept. 11, 1989.

As Amended on Denial of Rehearing and
Rehearing En Banc Nov. 14, 1989.

Joan B. Safford, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., David J. Stetler, Joan Bainbridges, James R. Ferguson, Victoria J. Peters, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, for plaintiff-appellee.

Julie L. Friedman, Chicago, for defendant-appellant.

Before CUDAHY and EASTERBROOK, Circuit Judges, and HENLEY, Senior Circuit Judge.[*]

CUDAHY, Circuit Judge.

Defendant William Goodstein appeals his conviction for bankruptcy fraud in violation of 18 U.S.C. section 152; conversion of profit sharing funds in violation of 18 U.S.C. section 664; mail and wire fraud in violation of 18 U.S.C. sections 1341, 1343; and interstate transportation of fraudulently obtained securities in violation of 18 U.S.C. section 2314. We affirm his conviction on all counts.

### I.

In 1977, defendant Goodstein had been a practicing lawyer for over forty years with considerable experience in bankruptcy law, when he arranged to acquire a business with his long-time cohort, Stanley Karp. Goodstein and Karp agreed to purchase the Paine Company ("Paine"), an Illinois manufacturer of hardware used in the construction industry, from Dan Polos. Goodstein incorporated a holding company, Travcor, Inc., as a vehicle to acquire Paine. The original purchase agreement required Travcor to pay $260,000 for the Paine stock, $240,000 for a covenant not to compete and $5,000 per month to lease the real estate where Paine was located. Goodstein and Karp borrowed substantial funds to meet these financial requirements and to invest working capital in the new enterprise. By 1981, Goodstein had personally invested $200,000 in Paine. Tr. at 205.

Due to a significant decline in the home building industry, the new venture did not

prove lucrative. When Travcor fell into default on payments to Polos, Goodstein negotiated refinancing for Paine through Foothill Capital Corporation ("Foothill"). In an effort to rescue Paine (and himself) from imminent financial collapse, Goodstein structured a deal with an acquaintance, Carl Hagle, in which Hagle agreed to manage Paine. According to Goodstein's arrangement with Hagle, if the latter succeeded in generating profits and if he assumed Paine's $200,000 debt to Goodstein, Hagle would be entitled to exercise an option to acquire a controlling interest in Paine. By 1982, Paine was facing immense financial pressures from Polos, who had filed suit for back rent and payments under the purchase agreement, and from Foothill, to which Paine owed over $300,000. Ultimately, on May 5, 1982, Paine filed a voluntary petition under Chapter 11, listing its ten largest unsecured creditors including Polos, and its principal secured creditor, Foothill. Meanwhile, Paine continued to hold Goodstein's $200,000 investment, a portion of which Goodstein had borrowed from third parties. In July and September of 1982, with approval of the bankruptcy court, Paine conducted sales of its assets and applied the proceeds to the outstanding Foothill debt.

By 1983, Hagle had not resuscitated Paine to a financially satisfactory condition as contemplated. Consequently, he resigned without purchasing the controlling stock or assuming Paine's debt to Goodstein pursuant to their agreement. While Paine was in reorganization as debtor-in-possession, Goodstein and Karp embarked on another endeavor to recapture their investments: they met with Robert Caldwell to negotiate a merger of Paine and Caldwell's company, Mid–Northern Industries ("Mid–Northern"). The merger proposal provided that Paine would consolidate its operations with Mid–Northern's at the Mid–Northern facility and that Travcor (Goodstein's ownership vehicle) would transfer ownership and control of Paine to Mid–Northern and, hence, ultimately to Caldwell. In exchange for all the outstanding stock in Paine, Mid–Northern would issue 20 percent of Mid–Northern's stock to Karp, while Paine's outstanding shareholder loans from Karp and Goodstein would be "recast" by Mid–Northern in the form of Mid–Northern corporate notes issued to Karp and Goodstein. *See* Tr. at 1377–79;

* The Honorable J. Smith Henley, Senior Circuit Judge for the Eighth Circuit, is sitting by designation.

Government App. A. According to Karp, Paine was to move its physical property to the Mid–Northern premises "[a]s soon as permission had been secured from the bankruptcy court and from Foothill which was the principal ... creditor." Tr. at 135. The parties agreed that Goodstein was responsible for notifying the bankruptcy court. Id.

In late August 1983, Foothill discovered that Paine had transferred its accounts receivable collections to an unauthorized account and had transferred some equipment to Mid–Northern's location without notice to Foothill or to the bankruptcy court, thereby allegedly jeopardizing Foothill's security interest in certain collateral. On August 30, 1983, Foothill filed a motion with the bankruptcy court objecting to Paine's transfers. Before the motion was heard, Foothill engaged in negotiations with Goodstein and drafted a tentative letter agreement consenting to Paine's relocation on the condition that Paine first sell its telephone system product line and apply the proceeds to the Foothill debt. The proposal stated that "Paine may take preparatory steps in pursuance [of the agreement], with Foothill's consent, prior to closing of the sale of the 'telephone lines.'" Appellant's Supp.App. at 3, 18. In addition, the proposal required approval of the bankruptcy court to effectuate the terms of the agreement. Id. at 4–16, 19.

On or about September 25, 1983, without having reached a final agreement with Foothill, without having consummated the sale of the telephone system, without having notified any creditors and without having obtained permission of the bankruptcy court, Goodstein, Karp and Caldwell proceeded to move additional Paine equipment and all the Paine inventory to the Mid–Northern premises. Thereafter, both a relocation agreement and a purchase agreement for the telephone system were backdated to September 14, 1983.

On September 27, 1983, Foothill filed a complaint in the bankruptcy court objecting to the relocation on the ground that Foothill had consented to the move only upon the condition that Paine sell its telephone system, which it had failed to do. See id. at 21–24. Thereafter, Paine and Foothill again entered negotiations and ultimately, on October 4, 1983, submitted to the bankruptcy court an agreed order purporting to prospectively approve the relocation, although, in fact, the move had already occurred. The court approved the submitted order the same day. Id. at 33–35.

In the spring of 1984, the unrelenting Goodstein/Karp/Caldwell confederacy made a final desperate effort to salvage Paine. Caldwell acquired DuPage Boiler Works ("DuPage"), a well-established, "cash-rich" manufacturer of steel water tanks. DuPage maintained a non-contributory profit sharing plan (the "Plan") for its employees, providing for lump sum payments of benefits. Goodstein assumed the position of director and corporate secretary of DuPage. In October 1984, Goodstein, expressing exasperation at the protracted litigation, reassured Foothill that Paine's outstanding debt to Foothill (approximately $471,000) would be liquidated by December 2, 1984. Tr. at 364–68; Government Ex. Terras 30. Thereafter, Caldwell appointed himself as the trustee of the DuPage Plan, which previously had been administered by the Union Mutual Life Insurance Company ("Union Mutual"). Pursuant to an agreement negotiated by Goodstein, Union Mutual wired $350,000 from the DuPage profit sharing account to the Harris Bank of Naperville. These funds were deposited into an account entitled "DuPage Boiler Works Profit Sharing Account," with respect to which Caldwell was the signatory.

Meanwhile, Goodstein and Foothill had agreed to restructure the Paine debt. Paine was to make three payments in December 1984 for a total of $155,000, then $20,000 a month until the debt was retired. Tr. at 369–70; Government Ex. Terras 31. These payments were made according to schedule with funds from the DuPage profit sharing account in Naperville. Checks were also issued from this account directly to Goodstein, who used the funds to discharge some of his personal debts. Tr. at 1431, 1460, 1463; Government App. K. As the government established at trial, such use of the DuPage Plan funds violated the terms of the Plan as well as ERISA.

On December 20, 1984, Caldwell amended the DuPage Plan by deleting the beneficiaries' option to receive a lump sum payment. Tr. at 1323; Government App. D. The government presented evidence at trial that this amendment also was contrary to the terms of the Plan and to ERISA. Beginning in early 1985, several beneficiaries of the DuPage Plan demanded payment of their benefits. Goodstein informed them that the law did not permit lump sum payments and that, in lieu of such payments,

they would receive five equal installments. Throughout the bankruptcy proceedings, Goodstein continued to provide spurious excuses to disgruntled Plan beneficiaries and to reassure them that payments would be forthcoming.

Paine continued to default on its payments to Foothill even after several restructured financing agreements. In the summer of 1985, Goodstein called Union Mutual requesting another $175,000 from the DuPage profit sharing funds still on deposit there. He sent a letter enclosing an authorization signed by Caldwell to expedite the withdrawal and requested that the proceeds be addressed to him personally by express mail. Tr. at 846–47; Government Ex. UNM 26, 27. Union Mutual sent the check to Goodstein and it was deposited in the Naperville DuPage profit sharing account. *See* Government App. D. On August 22, 1985, Goodstein received a $39,000 check signed by Caldwell drawn on the DuPage profit sharing account, which he deposited in the "William Goodstein Special Account" at Amalgamated Bank. Tr. at 1502. Goodstein applied a portion of this money toward the Foothill liability and a portion to his own personal debts. *See* Government Brief at 24.

Meanwhile, in July 1985, the bankruptcy case had been converted to a Chapter 7 liquidation and the debtor, Paine, lost all its corporate rights in the property. But the shell game continued, and in September, again without notice to the bankruptcy court or to Foothill, Paine and Mid–Northern covertly moved their operations to Northbrook, Illinois and their inventory to Glenview, Illinois. The trustee and Foothill eventually obtained a temporary restraining order to segregate the assets and to prevent their disposal.

In December 1985, pursuant to Goodstein's request, Union Mutual sent him the final payment from the profit sharing plan in the amount of $181,232, which was deposited in a new DuPage pension plan account at First Illinois Bank of Evanston. Subsequently, $100,000 was wired to "William Goodstein's Special Account," which Goodstein then withdrew and remitted to Foothill. This check, along with a $60,000

check drawn on an escrow account of an estate for which Goodstein served as trustee, were given to Foothill in full satisfaction of Paine's obligations to Foothill. During the year and a half in which the DuPage profit sharing funds were being withdrawn from Union Mutual, Goodstein himself received a total of $182,500 from the Plan funds. After deducting the payments Goodstein made in turn to Foothill, Goodstein retained $56,239 and reduced his personal indebtedness on loans related to his investment in Paine by $54,220. Government's Brief at 31. Goodstein was eventually charged in a multi-count indictment with bankruptcy fraud, conversion of profit sharing funds, mail and wire fraud and interstate transportation of fraudulently obtained securities. A jury found him guilty on all counts. He was sentenced to three years' imprisonment and five years' probation. Goodstein appeals his conviction, challenging the sufficiency of the evidence on all counts.

## II.

The standard of review applicable to challenges to the sufficiency of the evidence is clear. We will reverse a conviction on grounds of insufficiency of evidence only if, viewing the evidence in the light most favorable to the prosecution, we conclude that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### A. *Bankruptcy Fraud*

The criminal bankruptcy fraud statute, 18 U.S.C. section 152, makes it a crime for an agent or officer of a corporation knowingly and fraudulently to transfer or conceal the property of the corporation with intent to defeat the provisions of the bankruptcy laws. *See United States v. Turner*, 725 F.2d 1154, 1156 (8th Cir.1984).[1] Counts 1 and 2 of the indictment charge Goodstein with separate violations of section 152. Count 1 alleges that "in and around" September 1983, Goodstein, as an agent of Paine, "knowingly and fraudulently caused to be transferred certain property of Paine,

---

1. Title 18 U.S.C. section 152 provides:

    Whoever, either individually or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against him or any other person or corporation, or with intent to defeat the provisions of title 11, know-

ingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation ... [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

namely an interest in Paine," to Caldwell (acting on behalf of Mid–Northern) with intent to defeat the bankruptcy laws. *See* Superseding Indictment ¶ 4 at 2. Count 2 similarly charges that in and around September 1983, Goodstein, with intent to defeat the bankruptcy laws, "knowingly and fraudulently transferred certain property, namely inventory and equipment of Paine, which the defendant[ ] caused to be transferred from Paine ... to the premises of Mid–Northern...." *See id.* ¶ 3 at 3.

Goodstein's principal argument on appeal with respect to both counts is that the government failed to establish beyond a reasonable doubt that Goodstein possessed the requisite fraudulent intent to transfer property in circumvention of the bankruptcy laws. Goodstein contends that the government failed to prove fraudulent intent because the transfers of property complied adequately with the Bankruptcy Code's notice requirements. First, Goodstein argues that the government failed to prove fraudulent intent with respect to the transfer of "an interest in Paine" alleged in Count 1 because under the law Goodstein was free to transfer his own stock in Paine without notice or bankruptcy court approval. In his challenge to Count 2, Goodstein submits that the transfer of equipment and inventory to Mid–Northern's premises was not fraudulent because Foothill knew of the move in advance and it was retroactively approved by the bankruptcy court. In addition, Goodstein insists that the bankruptcy laws only required notice of this transfer to Foothill, Paine's sole secured creditor, since all the remaining creditors were unsecured and stood to recover nothing in bankruptcy. Finally, he asserts that, in any event, notice to creditors was unnecessary since both transfers occurred in the ordinary course of business and thus were exempt from the Bankruptcy Code's notice requirements. We shall discuss these arguments in turn.

The Bankruptcy Code forbids a debtor to use or sell property of the bankrupt estate other than in the ordinary course of business except "after notice and a hearing...." 11 U.S.C. § 363(b)(1). Before approving such a transaction, notice must be provided to "all creditors" at least 20 days in advance, except in certain limited circumstances (inapplicable here) where the bankruptcy court has found such notice unnecessary. *See* Fed.R.Bankr.P. 2002(a).

With respect to Count 1, Goodstein argues in his reply brief, as he did at oral argument, that the transfer of *Goodstein's* "interest in Paine" to Mid–Northern (and, hence, ultimately to Caldwell) cannot be deemed fraudulent under section 152. *See* Appellant's Reply Brief at 4. According to Goodstein, he was free to transfer his ownership interest in Paine (in the form of stock) to a third-party without complying with the Bankruptcy Code's notice and court approval requirements. For support, Goodstein relies on testimony presented at trial that a shareholder of a bankrupt corporation can transfer his stock without impediment.

In effect, Goodstein seems to argue that the government failed to prove a transfer of property *belonging to Paine* (and to the bankrupt estate), an essential element of bankruptcy fraud under section 152, although he cloaks his argument in different terms (primarily, in terms of lack of fraudulent intent). In this respect, Count 1 presents an apparently difficult problem because the transfer of the stock of a corporation in bankruptcy is not necessarily equivalent to the transfer of property of the corporation as required by the statutory language. However, Count 1 encompasses more than a routine sale of a few shares of stock. As the government established at trial, Count 1 entails a transfer of *control* of Paine and, in effect, a merger of Paine with Mid–Northern (with ultimate control passing to Caldwell). In essence, the stock transfer resulted in a transfer of property of the corporation because Paine was merged into Mid–Northern; presumably, Paine would cease to exist as a business entity and the ownership of Mid–Northern would be substituted for that of Paine. In any event, by reason of the change in control, the ultimate "interest" in the property of Paine would be transferred to Caldwell. A "transfer" is defined under the Bankruptcy Code to include "the sale and every other and different mode, direct or indirect, of disposing of or parting with property *or with an interest therein....*" *See* 11 U.S.C. § 101(50) (emphasis supplied). *See also* 2 E. Devitt & C. Blackman, *Federal Jury Practice & Instructions* § 49.04 at 333 (3d ed. 1977) (defining "fraudulent transfer" for purposes of bankruptcy fraud under section 152). Thus, we think that the transfer of an "interest in Paine" established here could

constitute a prohibited transfer under section 152 if done with fraudulent intent.

■ Moreover, such a transfer of ownership and control in Paine has as great, or greater, potential for prejudice to creditors as a transfer of Paine's physical property to another corporation or individual and, in our view, may be found to be fraudulent if done without notice to creditors or bankruptcy court approval as required under section 363(b) of the Bankruptcy Code. In *In re First International Services Corp.*, 25 B.R. 66 (Bankr.D.Conn.1982), the bankruptcy court concluded:

[T]he transfer of control of the debtor corporations is an event so inextricably related to the property of the debtors' estates that Code Section 363(b) must be read to include the requirement of notice and a hearing prior to the transfer.... The requirements of section 363(b) protect the creditors' interest in the assets of the estate. Thus it may be inferred from that Code section and others that creditors have an interest in those who control the assets of the estate.... [Creditors'] rights may well be lost, if the transfer of control of a debtor may occur without notice and an opportunity for a hearing.

*Id.* at 70 (citations omitted).[2] *Cf. United States v. Weichert*, 89 B.R. 346, 348 & n. 7, 350 (Bankr.S.D.N.Y.) (companies were fraudulently merged and newly created "shell companies" fraudulently acquired the inventory and assets of the bankrupt corporation without approval by the bankruptcy court in violation of the criminal

bankruptcy fraud statute), *aff'd mem.*, 862 F.2d 305 (2d Cir.1988), and *United States v. Weichert*, 783 F.2d 23, 25 (2d Cir.) (jury could infer fraudulent intent from defendant's diversion of substantial assets of bankrupt corporation to a newly formed company, with which the bankrupt corporation had effectively merged), *cert. denied*, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986).

The government established at trial that the transfer of an "interest in Paine" referred to the transfer of control pursuant to the merger agreement. Further, the district court carefully instructed the jury that, in order to convict under section 152, the government must establish that the property transferred belonged to the bankrupt estate. The court also instructed the jury that a transfer of property of the bankrupt estate under the Bankruptcy Code includes a transfer of an "interest" in that property. Defense counsel did not object to these instructions or proffer alternative instructions containing additional elucidation. *Cf. United States v. Weinstein*, 834 F.2d 1454, 1461 (9th Cir.1987). In light of the evidence presented by the government at trial describing the transfer of control in Paine through a merger with Mid–Northern, together with the above-noted instructions to the jury, we think that the transfer of an "interest in Paine" charged in Count 1 contravened the bankruptcy notice requirements and could indeed be deemed a fraudulent transfer of property of the bankrupt estate under section 152.[3]

---

**2.** *In re First International Services Corp.* was not a criminal bankruptcy fraud case under 18 U.S.C. section 152. Rather, it involved a challenge under 11 U.S.C. section 363(b) seeking to void a sale agreement that transferred control of the bankrupt corporation without notice and a hearing. The bankruptcy court declared that, in such circumstances, the failure to comply with the notice requirements rendered the agreement and transfer of stock null and void. *Id.* at 70–71.

**3.** We note that the "interest in Paine" terminology contained in Count 1 of the indictment is quite vague. Upon reviewing the record, it appears that at trial the government may have

altered its original theory underlying this charge. *See* Record at 67. However, all this is not entirely clear because Goodstein did not request a bill of particulars from which to ascertain precisely what "interest" is alleged in Count 1. As far as we can determine in the absence of a bill of particulars on this point, the proof at trial appears adequate under the broad language of the indictment. *See United States v. Pino–Perez*, 870 F.2d 1230, 1241 (7th Cir.1989) (Cudahy, J., dissenting in part). More importantly, Goodstein did not challenge the indictment as impermissibly vague in the court below, nor does he raise the issue on appeal; therefore, the issue is waived. *See United States v. Covelli*, 738 F.2d 847, 862 (7th Cir.1984).

■ With respect to Count 2, which charges a transfer of Paine's equipment and inventory to the Mid–Northern premises, Goodstein insists that Foothill knew in advance of the transfer and that, therefore, formal notice under the bankruptcy rules was not required.[4] He cites numerous cases in support of an "actual" or "constructive" notice theory. *See In re DCA Development Corp.*, 489 F.2d 43 (1st Cir. 1973); *Cameron v. Roemelmeyer*, 389 F.2d 599 (5th Cir.1968); *Hersh v. United States*, 68 F.2d 799 (9th Cir.1934); *In re Glinz*, 66 B.R. 88, 91 (Bankr.D.N.D.1986); *In re Toth*, 61 B.R. 160, 164, 166 (Bankr.N.D.Ill. 1986); *In re Torres*, 15 B.R. 794, 797 (Bankr.E.D.N.Y.1981). In these cases, the courts determined that the bankruptcy notice requirements were adequately complied with if a creditor, who had not received formal written notice, had actual knowledge of the transaction and an opportunity to raise objections. *See id.*

Goodstein argues that a letter dated September 6, 1983, from Foothill indicates that Foothill in fact knew of the planned relocation. The letter (which appears in various unsigned, revised forms) purports to confirm an agreement between Paine and Foothill in which Foothill agreed to the relocation of Paine's business to the Mid–Northern premises. But this agreement provided, *inter alia*, that Paine first sell its telephone system and remit the proceeds to Foothill. The agreement was also subject to court approval. *See* Appellant's Supp. App. at 1–20.

The import of this unsigned letter is questionable. The September 6 draft agreement permitted Paine to transfer its property, subject to court approval, only if Paine first sold its telephone system and applied the proceeds to the Foothill debt. However, in derogation of this agreement, Paine proceeded to transfer its property without complying with the pre-condition of sale of the telephone system, without notifying Foothill and without obtaining prior approval from the bankruptcy court.[5] When Foothill learned that the move had occurred prematurely, it filed a motion with the bankruptcy court on September 27, 1983, objecting to the relocation. Before the bankruptcy court had the opportunity to rule on this motion, the parties entered negotiations and, on October 4, 1983, submitted an agreed order to the court purporting to grant Paine approval to transfer equipment, inventory and lines of business to the Mid–Northern premises. Nowhere does the stipulated order mention that, in fact, the relocation had already been consummated. *See* Appellant's Supp.App. at 33–35. Indeed, there is no indication that the bankruptcy court was ever apprised of the fact that the move had already occurred,[6] or that the court intended to retroactively ratify the transfer of property that Paine had made without notice to creditors. We need not decide whether (for purposes of criminal bankruptcy fraud) the bankruptcy court possessed the authority to ratify such a transfer of property *nunc pro tunc* for it appears that the agreed order had some of the earmarks of a fraud, de-

---

**4.** Goodstein concedes that Foothill apparently did not have advance notice of the transfer alleged in Count 1. *See* Appellant's Reply Brief at 3.

**5.** Paine's surreptitious transfer of substantial equipment and inventory clearly contravened the terms of the draft agreement, notwithstanding the provision that "Paine may take preparatory steps in pursuance [of the agreement] with Foothill's consent, prior to closing of the sale of the 'telephone lines'". Appellant's Supp.App. at 3. Notwithstanding Goodstein's assertions to the contrary, the transfer cannot be construed as a mere "preparatory step"; nor did it occur with Foothill's consent as required under the agreement.

**6.** Although Foothill's motion, which was filed with the bankruptcy court on September 27, 1983, *see* Appellant's Supp.App. at 24, objected to the Paine relocation on the ground that Paine had "undertaken to move substantial portions of its equipment and inventory to the business premises of Mid–Northern ... without Foothill's consent" and in violation of a prior agreement between the parties, it is uncertain whether the district court ever reviewed this motion since the parties eventually settled their differences and submitted an agreed order to the court on October 4, 1983. The agreed order was deceptively drafted in prospective terms, purporting to pre-approve a subsequent relocation of Paine.

ceiving the court into granting Paine permission to do what it had in fact already done without the required notice or court approval. The fact that Foothill learned of the relocation after the fact, and submitted an agreed order seeking retroactive court approval, does not necessarily cure the illegality of the transfer. *Cf. In re Adeeb*, 787 F.2d 1339, 1345 (9th Cir.1986) (subsequent disclosure does not undo an illegal transfer).

At all events, even if Goodstein had provided Foothill with notice (constructive or otherwise) of the transfer of equipment and inventory charged in Count 2, such notice would not have excused Paine from its obligation to notify its other unsecured creditors. Goodstein asserts that notice to Foothill, Paine's only secured creditor, was sufficient because the other creditors were unsecured and would receive nothing in the bankruptcy. However, Goodstein cites no persuasive authority for the proposition that the bankruptcy notice requirements can be dispensed with simply by notifying secured creditors if the prospects of other creditors are sufficiently unpromising. Bankruptcy Rule 2002(a)(2) by its express terms requires notice to "all creditors." *See In re Robert L. Hallamore Corp.*, 40 B.R. 181, 182 (Bankr.D.Mass.1984); *In re WHET, Inc.*, 12 B.R. 743, 746 (Bankr.D. Mass.1981); *In the Matter of Cameo Tile*

*Distribs., Inc.*, 17 B.R. 28 (Bankr.M.D.Fla. 1981); *cf. In re Adeeb*, 787 F.2d at 1343 (In order to bar discharge, title 11 U.S.C. section 14(c) requires only that the debtor transfer property with intent to hinder, delay, or defraud "a creditor" not "all creditors."); *Kolesinski v. Mashey*, 127 F.2d 528 (2d Cir.1942). Nowhere do the Bankruptcy Code or Rules suggest that the notice requirements do not apply to unsecured creditors.[7] Indeed, carving out such an exception to the broad notice rules would be inimical to the Bankruptcy Code's purpose of ensuring equitable treatment of *all* creditors. *See In re Adeeb*, 787 F.2d at 1345 (citations omitted).[8] In describing the contours of the criminal bankruptcy fraud statute, the court in *In re May*, 12 B.R. 618 (N.D.Fla.1980) stated:

> Section 152 of Title 18 is a congressional attempt to cover all of the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through any type of effort to keep assets from being equitably distributed among creditors. *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir.1970); 2A *Collier* § 29.04[2].

*Id.* at 625.[9] In furthering the aims of the bankruptcy statutes, we must rigorously enforce the rights of creditors, both secured and unsecured. Hence, despite Goodstein's protestations that he acted law-

---

**7.** Goodstein cites *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3d Cir.1985), for the principle that notice to unsecured creditors is not required. However, Goodstein misapprehends the holding in *Southern Railway*. In that case, the court relied on Bankruptcy Rule 2002(i), which provides that the court "may order that notices ... be mailed only to the committees or their ... agents and to the creditors ... who file with the court a request that all notices be mailed to them." In *Southern Railway*, notice of the sale of property was provided to the Committee of Unsecured Creditors. One of the unsecured creditors had not filed with the court a request that it receive notice. The Third Circuit determined that under Rule 2002(i), notice to the Committee was sufficient. 758 F.2d at 140–41. Because there was no notice given to a committee of unsecured creditors in the present case, and there was no court order requiring individual unsecured creditors to file requests for individual notice as authorized un-

der Rule 2002(i), *Southern Railway* is clearly inapposite.

**8.** In *In re Adeeb*, 787 F.2d at 1345, the court articulated the two-fold purpose of the bankruptcy statutes:

> [F]irst, to secure the equitable distribution of the bankrupt's estate among his creditors, and, second, " 'to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh from the obligations and responsibilities consequent upon business misfortune.' " [citations omitted].

**9.** *See also United States v. Shapiro*, 101 F.2d 375, 379 (7th Cir.) (objective of bankruptcy fraud criminal statute is "to punish those debtors who, although wanting relief from their debts, did not want to surrender what property there was to the creditors;" affirming conviction for denuding corporation of its property immediately prior to filing bankruptcy petition), *cert. denied*, 306 U.S. 657, 59 S.Ct. 774, 83 L.Ed. 1054 (1939).

fully and with benign motivations, we think that the evidence was sufficient for a jury to conclude that the transfer of property without notice to any of Paine's unsecured creditors and without the required approval of the bankruptcy court was accomplished fraudulently in violation of section 152.

■ Finally, Goodstein claims that the consolidation and relocation of Paine's business was in the ordinary course of business and, therefore, exempt from the notice requirements of section 363(b).[10] We dis-It is not a routine or ordinary event to transfer control of one manufacturing company to another, effectively merging the two companies, or to relocate substantial portions of a company's equipment and inventory to the premises of another. *See In re First International Services Corp.*, 25 B.R. at 70; *In re Fountain Bay Mining Co.*, 46 B.R. 122, 124 (Bankr.W.D.Va.1985); *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.), *rev'd on other grounds*, 801 F.2d 60 (2d Cir.1986).

■ In sum, we believe that a jury could have concluded that the transfers of property alleged in Counts 1 and 2 were fraudulent and committed with intent to defeat the bankruptcy laws as required to support a conviction under section 152. Fraudulent intent may be proved by circumstantial evidence. *In re Mays*, 12 B.R. at 626.

> Persons whose intention is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct. *In re Saphire*, 139 F.2d 34, 35 (2d Cir.1943); *In re Freudmann*, 362 F.Supp. 429 (S.D. N.Y.1973), *aff'd*, 495 F.2d 816 (2d Cir. 1974).

*In re May*, 12 B.R. at 627.

The evident pattern of Goodstein's self-dealing endowed his actions with an aura of fraud. Goodstein advanced $200,000 to Paine for stock and as operating capital, and sought vigorously to recapture these funds. Acutely aware of Paine's ailing financial condition, Goodstein employed Hagle to manage Paine and offered him an option to buy out Goodstein's investment. Goodstein then opposed Hagle's recommendation to convert Paine's Chapter 11 proceedings into a Chapter 7 liquidation since such a conversion would prevent Goodstein from recouping his investment. Once in bankruptcy, with disregard for the interests of creditors, he instructed his partner, Karp, to pursue the possibility of selling

**10.** More specifically, Goodstein argues that "Paine was forced to relocate because of problems with its landlord, caused in good part by Foothill's refusal to pay the rent. The relocation of its business, under these circumstances, is an action which could easily be deemed to arise in the normal course of business." Appellant's Brief at 30. We find little merit in this argument. If the debtor was being forced to move because of a cash crunch, it would have taken little effort to apprise the bankruptcy court of the debtor's problem. Indeed, it appears that Paine complained repeatedly to the court of Foothill's reluctance to forward cash due Paine. These complaints, at one point, resulted in a court order requiring Foothill to pay Paine's rent. Appellant's Brief at page 7. Yet, Goodstein fails to explain why, if his assertion is true, he never attempted to get permission from the court for Paine to relocate—after he had already gone to the trouble of getting a court order in an attempt to resolve the very same problem. Such a quiet relocation does not seem to constitute "normal course of business."

Similarly, we are unpersuaded by Goodstein's argument that the previous court order concerning rent payment provided sufficient notice to Foothill and the bankruptcy court that Paine was being forced to move. Both Foothill and the bankruptcy court knew that Paine was having cash flow problems. (Indeed, notice to this effect was apparent from Paine's involvement in bankruptcy proceedings.) But, neither was told flat out of the apparent gravity of Paine's problems with its landlord. It does not necessarily follow that a business having trouble paying its rent will be forced to move *immediately* by its landlord. If landlord problems were, indeed, the reason for Paine's clandestine relocation, it would have been easy to say as much before the move. Goodstein offers no reasons to account for his failure to give specific notice of this problem. From these and other facts, a jury would not have had difficulty in concluding that such a move involved fraudulent intent.

Paine. The merger agreement between Paine and Mid–Northern recast Paine's obligation to Goodstein, making him a creditor of Mid–Northern rather than of the bankrupt Paine and thus affording Goodstein another chance to recover his investment. In addition, Goodstein's extensive legal background and integral role in Paine's bankruptcy affairs indicate that the failure to notify the bankruptcy court and creditors of the transfers was not inadvertent. Goodstein was a knowledgeable businessman and lawyer. (He apparently needed a refresher course in Legal Ethics, not Bankruptcy 101.) He participated in two sales of assets, prior to the proposed merger with Mid–Northern, which took place with proper notice to creditors and with bankruptcy court approval. Moreover, the draft agreements that Goodstein negotiated with Mid–Northern and Foothill contained clauses recognizing the parties' obligations to procure bankruptcy court approval of their actions. Viewing the evidence in the light most favorable to the government, we think a jury could reasonably conclude that Goodstein possessed the requisite fraudulent intent to defeat the bankruptcy laws. *See United States v. McClellan*, 868 F.2d 210, 216 (7th Cir.1989).

### B. *Conversion*

■ Goodstein also contends that the evidence was insufficient to convict him of converting profit sharing funds in violation of 18 U.S.C. section 664.[11] This is a much easier question than those related to the bankruptcy fraud counts. Goodstein does not deny that the DuPage profit sharing funds were used unlawfully. *See* Appellant's Reply Brief at 10. Instead, Goodstein submits that, while the evidence at trial indeed demonstrated that Goodstein *misapplied* profit sharing funds, the evidence did not establish *conversion* because Goodstein never had lawful possession of, or access to, the Plan funds. Thus, he argues that there was a fatal variance between the proof offered at trial, demonstrating misapplication of funds, and the indictment, which alleged conversion.

Goodstein cites numerous case authorities stating that, in order to be convicted of *embezzlement*, the defendant must have been in lawful possession of or had lawful access to the property at the time of its appropriation. *See United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986); *United States v. Whitlock*, 663 F.2d 1094, 1098 (D.C.Cir.1980); *United States v. Mack*, 525 F.Supp. 382 (N.D.Texas 1981). But Goodstein was not charged with the crime of embezzlement; rather, the indictment charges that both Goodstein and Caldwell "did unlawfully and wilfully convert and cause to be converted to their own use [funds] drawn on the DuPage Boiler Works Profit Sharing Account, ... which were moneys, ... of the DuPage [Plan], ..." *See* Superceding Indictment at 19–21, 36.[12] Goodstein cites no relevant authority to support his contention that lawful possession and access is an essential element of conversion under section 664. Contrary to Goodstein's assertion, the fact that he was not a signatory on the DuPage profit sharing accounts, a status that would have afforded him lawful possession of the funds, is not dispositive.

Judge Kocoras thoroughly instructed the jury that the government was required to prove that Goodstein converted or caused to be converted, to his own use or the use of another, moneys belonging to the Plan, and that the defendant acted willfully and

---

**11.** Title 18 U.S.C. section 664 provides:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee pension benefit plan, or of any fund connected therewith, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

As used in this section, the term any employee welfare benefit plan or employee pension plan means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

**12.** The separate acts of conversion alleged in counts 10, 11, 12 and 27 each employ similar language except that count 27 states "converted to their own use and to the use of Foothill...." Superseding Indictment at 36.

unlawfully. *See* Tr. at 1807–08. The judge also instructed that "the term convert as used in section 664 means the use of profit sharing funds in an unauthorized manner or to an unauthorized extent" and that it is unlawful for any fiduciary of an employee benefit plan to discharge his duties other than in the sole interest of the participants for the exclusive purpose of providing benefits. *See id.* Further, the judge instructed the jury that a person is a fiduciary with respect to a benefit plan to the extent that he has discretionary authority or responsibility in the administration of such a plan or exercises any control regarding the management or disposition of its assets. Tr. at 1809. *See* 29 U.S.C. § 1002(21)(A)(i) and (iii); *Mutual Life Insur. Co. of New York v. Yampol,* 840 F.2d 421, 425 (7th Cir.1988). Goodstein did not object to these instructions nor does he challenge them on appeal. Moreover, we think the instructions correctly state the law relating to criminal conversion of profit sharing funds under section 664. *See United States v. Snyder,* 668 F.2d 686, 690–91 (2d Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982); *United States v. Santiago,* 528 F.2d 1130 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1970); *cf. United States v. Ford,* 632 F.2d 1354 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981); *United States v. Andreen,* 628 F.2d 1236 (9th Cir.1980); *United States v. Felice,* 481 F.Supp. 79 (N.D. Ohio 1978).

The government adduced evidence at trial indicating that Goodstein played an active role in administering the DuPage Plan. While serving in the capacity of director and corporate secretary of DuPage, Goodstein negotiated and arranged several withdrawals of Plan funds from Union Mutual. He arranged the wire transfers from Union Mutual to coincide with the due dates of payments on the Paine/Mid–Northern debt to Foothill. *See* Government App. B. Union Mutual disbursed approximately $681,-000 of Plan funds to Goodstein and Caldwell, and, of that amount, less than $27,000 went to pay beneficiaries. More than $180,000 of Plan funds were paid directly to Goodstein, who used approximately $56,-000 to meet the demands of his personal indebtedness and for other personal purposes. *See* Government App. K. In addition, Goodstein dealt with Plan participants on behalf of DuPage Boiler, lulling them with false reassurances while mulcting them of their benefits. He was clearly a fiduciary with discretionary authority or discretionary responsibility in the administration of the DuPage Plan. Viewing the evidence in the light most favorable to the government, we think a reasonable jury could have concluded that Goodstein, acting in a fiduciary capacity, knowingly used profit sharing funds in an unauthorized manner, thereby converting the funds in violation of 18 U.S.C. section 664.

C. *Mail and Wire Fraud; Interstate Transportation of Securities*

Finally, Goodstein maintains that because the government failed to prove bankruptcy fraud or conversion of profit sharing funds, there was no illegal scheme upon which to base the convictions for mail fraud, wire fraud and interstate transportation of fraudulently obtained securities. Our affirmance of Goodstein's convictions for bankruptcy fraud and conversion renders Goodstein's argument meritless.

### III.

In sum, we conclude that the evidence was sufficient to sustain Goodstein's conviction for bankruptcy fraud, conversion of profit sharing funds, mail and wire fraud and interstate transportation of fraudulently obtained securities.

AFFIRMED.